[No. S142892. Aug. 18, 2008.]

NORTH COAST WOMEN'S CARE MEDICAL GROUP, INC., et al.,
Petitioners, v.
THE SUPERIOR COURT OF SAN DIEGO COUNTY, Respondent;
GUADALUPE T. BENITEZ, Real Party in Interest.

## COUNSEL

Cole Pedroza, Curtis A. Cole, Kenneth R. Pedroza, Matthew S. Levinson; DiCaro, Coppo & Popcke, Robert C. Coppo, Gabriele M. Prater, Andrew T. Evans; Advocates for Faith and Freedom, Robert H. Tyler; Alliance Defense Fund, Timothy D. Chandler and Douglas L. Edgar for Petitioners.

Robert G. Ho for Pacific Justice Institute as Amicus Curiae on behalf of Petitioners.

Law Offices of Karen D. Milam, Karen D. Milam; Americans United for Life and Mailee R. Smith for Christian Medical and Dental Associations, American Association of Pro Life Obstetricians and Gynecologists and Physicians for Life as Amici Curiae on behalf of Petitioners.

James L. Hirsen and Deborah J. Dewart for The Foundation for Free Expression as Amicus Curiae on behalf of Petitioners.

Duane Morris, Mitchell L. Lathrop and Bridget K. Moorhead for Catholic Exchange, Inc., and Human Life International as Amici Curiae on behalf of Petitioners.

Patrick T. Gillen; Charles S. LiMandri and Teresa L. Mendoza for Thomas More Law Center as Amicus Curiae on behalf of Petitioners.

Alan J. Reinach; Alan E. Brownstein; Bassi, Martini & Blum and Fred Blum for Seventh-day Adventist Church State Council as Amicus Curiae on behalf of Petitioners.

Center for Law & Religious Freedom, Samuel B. Casey and Gregory S. Baylor for Christian Legal Society as Amicus Curiae on behalf of Petitioners.

Higgs, Fletcher & Mack, Richard D. Barton and John Morris for The Islamic Medical Association of North America, Rabbi Elliot Dorff, Rabbi David Frank and Rabbi Arthur Gross-Schaefer as Amici Curiae on behalf of Petitioners.

Public Affairs & Religious Liberty, Alan J. Reinach; Sweeney & Greene, James F. Sweeney and Stephen J. Greene for California Catholic Conference as Amicus Curiae on behalf of Petitioners.

Edwin Meese III and Peter Ferrara for American Civil Rights Union as Amicus Curiae on behalf of Petitioners.

Thelen Reid & Priest and Curtis A. Cole for California Medical Association as Amicus Curiae on behalf of Petitioners.

No appearance for Respondent.

Albert C. Gross; Lambda Legal Defense and Education Fund, Jennifer C. Pizer, Jon W. Davidson; Eisenberg & Hancock, Jon B. Eisenberg; O'Melveny & Meyers, Robert C. Welsh, Margaret C. Carroll, James J. McNamara and Lee K. Fink for Real Party in Interest.

Steven R. Zatkin, Stanley B. Watson and Mark S. Zemelman for Kaiser Foundation Health Plan, Inc., The Permanente Medical Group, Inc., and The Southern California Permanente Medical Group as Amici Curiae on behalf of Real Party in Interest.

Winston & Strawn, Benjamin Russell Martin, Gail J. Standish, Peter E. Perkowski and Kyle R. Gehrmann for National Health Law Program, Asian Pacific AIDS Intervention Team, Asian Pacific American Legal Center of Southern California, Bienstar Human Services, California Latinas for Reproductive Justice, California Pan-Ethnic Health Network, California Women's Law Center, Coalition for Humane Immigrant Rights of Los Angeles, Jordan Rustin Coalition, Khmer Girls in Action, Latino Coalition for a Healthy California, Merger Watch Project, Mexican American Legal Defense Fund and Educational Fund, Zuna Institute, Anti-Defamation League, American Academy of HIV Medicine, American Medical Students Association, Gay and Lesbian Medical Association, International Association of Physicians in AIDS Care, The Mautner Project, National Center for Lesbian Rights and National Health Law Program as Amici Curiae on behalf of Real Party in Interest.

Shannon Minter, Vanessa H. Eisemann, Melanie Rowen and Catherine Sakimura for National Center for Lesbian Rights, Lyon-Martin Women's Health Services, Inc., The Mautner Project, Bay Area Lawyers for Individual Freedom and Lesbian and Gay Lawyers Association of Los Angeles as Amici Curiae on behalf of Real Party in Interest.

Morrison & Foerster, Angela L. Padilla and Elizabeth O. Gill for Gay and Lesbian Medical Association, American Medical Student Association, American Academy of HIV Medicine and International Association of Physicians in Aids Care as Amici Curiae on behalf of Real Party in Interest.

James D. Esseks; Sondra Goldschein; Margaret C. Crosby, Alex M. Cleghorn; Clare Pastore; and David Blair-Loy for American Civil Liberties Union Foundation, American Civil Liberties Union of Northern California, ACLU Foundation of Southern California and American Civil Liberties Union of San Diego and Imperial Counties as Amici Curiae on behalf of Real Party in Interest.

Edmund G. Brown, Jr., Attorney General, Manuel M. Medeiros, State Solicitor General, Thomas J. Greene, Chief Assistant Attorney General, Louis Verdugo, Jr., Assistant Attorney General, Angela Sierra and Antonette Benita Cordero, Deputy Attorneys General, as Amici Curiae on behalf of Real Party in Interest.

## OPINION

**KENNARD, J.**—Do the rights of religious freedom and free speech, as guaranteed in both the federal and the California Constitutions, *exempt* a medical clinic's physicians from complying with the Unruh Civil Rights Act's (Civ. Code, § 51) prohibition against discrimination based on a person's sexual orientation? Our answer is no.

### I

This case comes to us after the trial court granted plaintiff's motion for summary adjudication of one affirmative defense, thereby determining that no triable issue of material fact existed as to the defense and that plaintiff was entitled to judgment on the defense as a matter of law. (See Code Civ. Proc., § 437c, subds. (c), (f)(1).) The Court of Appeal issued a writ of mandate setting aside that ruling on the ground that it failed to completely dispose of the affirmative defense and thus was contrary to the statutory requirements for summary adjudication. (See Code Civ. Proc., § 437c, subd. (f)(1).) Because this case reached us pretrial, after the trial court granted plaintiff's motion for summary adjudication, our factual description comes primarily from the parties' statements of undisputed facts filed in connection with that motion.

Plaintiff Guadalupe T. Benitez is a lesbian who lives with her partner, Joanne Clark, in San Diego County. They wanted Benitez to become pregnant, and they decided on intravaginal self-insemination, a nonmedical process in which a woman inserts sperm into her own vagina. Benitez and Clark used sperm from a sperm bank. In 1999, after several unsuccessful efforts at pregnancy through this method, Benitez was diagnosed with polycystic ovarian syndrome, a disorder characterized by irregular ovulation, and she was referred to defendant North Coast Women's Care Medical Group, Inc. (North Coast), for fertility treatment.

In August 1999, Benitez and Clark first met with defendant Christine Brody, an obstetrician and gynecologist employed by defendant North Coast. Benitez mentioned that she was a lesbian. Dr. Brody explained that at some point intrauterine insemination (IUI) might have to be considered. In that medical procedure, a physician threads a catheter through the patient's cervix and inserts semen through the catheter into the patient's uterus. Dr. Brody said that if IUI became necessary, her religious beliefs would preclude her from performing the procedure for Benitez.[1] According to Dr. Brody, she told

---

[1] The parties dispute the factual basis for Dr. Brody's religious objection to performing IUI for plaintiff. Dr. Brody claims that her religious beliefs preclude her from active participation

Benitez and Clark at that initial meeting that her North Coast colleague, Dr. Douglas Fenton, shared her religious objection to performing IUI for an unmarried woman, but that either of two other North Coast physicians, Dr. Charles Stoopack and Dr. Ross Langley, could do the procedure for Benitez. According to Benitez, however, Dr. Brody said that she was the only North Coast physician with a religious objection to performing IUI for Benitez, and that "all other members of her practice—whom she believed lacked her bias—would be available" to do this medical procedure.

From August 1999 through June 2000, Dr. Brody treated Benitez for infertility. The treatment consisted chiefly of prescribing Clomid, an ovulation-inducing medication, followed by Benitez's use of intravaginal self-insemination with sperm obtained from a sperm bank. To determine whether Benitez's fallopian tubes were blocked, Dr. Brody had her take a medical test (hysterosalpingiogram), which was negative. After performing a surgical procedure (diagnostic laparoscopy), Dr. Brody determined that Benitez's infertility was not the result of endometriosis.[2]

According to Benitez, when in April 2000 she still had not become pregnant, she decided "with the advice and consent of Dr. Brody," to try IUI, which, as explained earlier, is a medical procedure in which a physician uses a catheter to insert sperm directly into the patient's uterus. Instead, in May 2000, Benitez resorted to the nonmedical procedure of intravaginal self-insemination that she had used before; but this time, rather than using sperm from a sperm bank as she had done earlier, she used fresh sperm donated by a male friend. When Benitez thereafter missed a menstrual period, she thought she was pregnant. But a home pregnancy test was negative, and a pregnancy test done at defendant North Coast's facilities on July 5, 2000, confirmed that she was not pregnant. Benitez then decided to try IUI, using her friend's fresh sperm.

---

in medically causing the pregnancy of *any unmarried* woman, and therefore her refusal to perform IUI for Benitez was based on Benitez's marital status, not her sexual orientation. But Benitez, whose complaint does not allege marital status discrimination, asserts that Dr. Brody objected to performing IUI for *a lesbian,* and consequently the alleged denial of the medical treatment at issue constituted sexual orientation discrimination. The trial court ruled that the factual basis for Dr. Brody's objection presented a disputed issue of material fact to be resolved at trial.

In so ruling, the trial court apparently concluded that, at the times relevant here, California's Unruh Civil Rights Act did not prohibit discrimination based on marital status. The Court of Appeal in this case expressly so held. Because Benitez's claim for relief under the Unruh Civil Rights Act is not based on marital status discrimination, we do not address that issue.

[2] "Endometriosis is a condition in which tissue similar to the lining of the uterus" occurs on the ovaries, the fallopian tubes, or elsewhere in the body. Between 30 and 40 percent of women with this condition may suffer from infertility. (See <http://www.endometriosis.org/endometriosis.html> [as of Aug. 18, 2008].)

The parties agree that when Benitez told Dr. Brody she wanted to use her friend's donated fresh sperm for the IUI, Brody replied that this would pose a problem for North Coast. Its physicians had performed IUI either with fresh sperm provided by a patient's husband or sperm from a sperm bank, but never with fresh sperm donated by a patient's friend. To do the latter, Dr. Brody said, might delay the procedure as North Coast would first have to confirm that its protocols pertaining to donated fresh sperm would satisfy the requirements of North Coast's state tissue bank license and the federal Clinical Laboratory Improvement Amendments of 1988 (42 U.S.C. § 263). After hearing this, Benitez opted to have the IUI with sperm from a sperm bank. Dr. Brody so noted in Benitez's medical records and then left for an out-of-state vacation.

During Dr. Brody's absence, her colleague, Dr. Douglas Fenton, took over Benitez's medical care. Dr. Fenton contends that he was unaware of Dr. Brody's record notation of Benitez's decision *not* to use her friend's fresh sperm for the IUI, because the secretary who had typed that notation in Benitez's file left it in Dr. Brody's in-box awaiting her return from vacation. Therefore, according to Dr. Fenton, he mistakenly believed that Benitez intended to have IUI with fresh sperm donated by a friend. The parties agree that unlike sperm from a sperm bank, fresh sperm (even when provided by a patient's husband) requires "certain preparation" before it can be used for IUI, and that "[c]ertain licensure" is necessary to do the requisite sperm preparation. Of North Coast's physicians, only Dr. Fenton was licensed to perform these tasks. But he refused to prepare donated fresh sperm for Benitez because of his religious objection. Two of his colleagues, Drs. Charles Stoopack and Ross Langley, had no such religious objection, but unlike Dr. Fenton, they were not licensed to prepare fresh sperm. Dr. Fenton then referred Benitez to a physician outside North Coast's medical practice, Dr. Michael Kettle.

The IUI performed by Dr. Kettle did not result in a pregnancy. Benitez was unable to conceive until June 2001, when Dr. Kettle performed in vitro fertilization.[3]

In August 2001, Benitez sued North Coast and its physicians, Brody and Fenton, seeking damages and injunctive relief on several theories, notably sexual orientation discrimination in violation of California's Unruh Civil Rights Act. Defendants' answer to the complaint asserted a variety of affirmative defenses. Pertinent here is affirmative defense No. 32 stating that

---

[3] In vitro fertilization is a medical procedure of assisted reproduction in which eggs and sperm are combined in a laboratory dish. When fertilization results, the embryo is transferred to the woman's uterus for development. (See <http://www.americanpregnancy.org/infertility/ivf.html> [as of Aug. 18, 2008].)

defendants' "alleged misconduct, if any" was protected by the rights of free speech and freedom of religion set forth in the federal and state Constitutions.

Benitez moved for summary adjudication of that defense. The trial court granted the motion, ruling that neither the federal nor the state Constitution provides a religious defense to a claim of sexual orientation discrimination under California's Unruh Civil Rights Act. Defendants challenged that ruling through a petition for writ of mandate filed in the Court of Appeal. That court granted the petition with respect to the two physician defendants only, thereby allowing Drs. Brody and Fenton to later assert at trial that their constitutional rights of free speech and religious freedom exempt them from complying with the Unruh Civil Rights Act's prohibition against sexual orientation discrimination. We granted Benitez's petition for review.

## II

Benitez's claim of sexual orientation discrimination is based on California's Unruh Civil Rights Act (hereafter sometimes Act). (Civ. Code, § 51, subd. (a).) At the times relevant here, it provided: "All persons within the jurisdiction of this state are free and equal, and no matter what their sex, race, color, religion, ancestry, national origin, disability, or medical condition are entitled to the full and equal accommodations, advantages, facilities, privileges, or services in all business establishments of every kind whatsoever." (Civ. Code, § 51, former subd. (b), as amended by Stats. 2000, ch. 1049.)

The Unruh Civil Rights Act's antidiscrimination provisions apply to business establishments that offer to the public "accommodations, advantages, facilities, privileges, or services." (Civ. Code, § 51, subd. (b); see *Curran v. Mount Diablo Council of the Boy Scouts* (1998) 17 Cal.4th 670, 700 [72 Cal.Rptr.2d 410, 952 P.2d 218]; *Warfield v. Peninsula Golf & Country Club* (1995) 10 Cal.4th 594, 622–623 [42 Cal.Rptr.2d 50, 896 P.2d 776].) A medical group providing medical services to the public has been held to be a business establishment for purposes of the Act. (*Leach v. Drummond Medical Group, Inc.* (1983) 144 Cal.App.3d 362 [192 Cal.Rptr. 650].)

In 1999 and 2000, the period relevant here, the Unruh Civil Rights Act did not list sexual orientation as a prohibited basis for discrimination. But before 1999, California's reviewing courts had, in a variety of contexts, described the Act as prohibiting sexual orientation discrimination. (See *Harris v. Capital Growth Investors XIV* (1991) 52 Cal.3d 1142, 1155 [278 Cal.Rptr. 614, 805 P.2d 873]; *Curran v. Mount Diablo Council of the Boy Scouts, supra*, 17 Cal.4th 670, 703 (conc. opn. of Mosk, J.); *Hubert v. Williams* (1982) 133 Cal.App.3d Supp. 1, 5 [184 Cal.Rptr. 161]; see also *Stoumen v. Reilly* (1951) 37 Cal.2d 713, 716 [234 P.2d 969]; *Rolon v. Kulwitzky* (1984) 153 Cal.App.3d

289, 292 [200 Cal.Rptr. 217].) Through an amendment to the Act in 2005, the Legislature expressly prohibited sexual orientation discrimination. (Stats. 2005, ch. 420, § 3.)

The Unruh Civil Rights Act subjects to liability "[w]hoever denies, aids or incites a denial, or makes any discrimination or distinction contrary to [the Act]." (Civ. Code, § 52, subd. (a).) Thus, liability under the Act for denying a person the "full and equal accommodations, advantages, facilities, privileges, or services" of a business establishment (Civ. Code, § 51, subd. (b)) extends beyond the business establishment itself to the business establishment's employees responsible for the discriminatory conduct.

Below, we discuss defendant physicians' claims, first under the federal Constitution, and then under the California Constitution.

## III

■ The First Amendment to the federal Constitution states that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech . . . ." (U.S. Const., 1st Amend.) This provision applies not only to Congress but also to the states because of its incorporation into the Fourteenth Amendment. (See *Employment Div., Ore. Dept. of Human Res. v. Smith* (1990) 494 U.S. 872, 876–877 [108 L.Ed.2d 876, 110 S.Ct. 1595] (*Smith*).) With respect to the free exercise of religion, the First Amendment "first and foremost" protects "the right to believe and profess whatever religious doctrine one desires." (*Smith, supra*, at p. 877.) Thus, it "obviously excludes all 'government regulation of religious *beliefs* as such.' " (*Ibid.*) Below, we discuss pertinent decisions of the high court construing the First Amendment's guarantee of the free exercise of religion.

*Sherbert v. Verner* (1963) 374 U.S. 398 [10 L.Ed.2d 965, 83 S.Ct. 1790] (*Sherbert*) involved South Carolina's denial of unemployment benefits to a Seventh-day Adventist who refused on religious grounds to work on Saturdays. The high court held that restricting unemployment benefit eligibility to those who could work on Saturdays was a "substantial infringement" of the claimant's First Amendment rights, and it declared the state law unconstitutional because it lacked a "compelling [governmental] interest." (374 U.S. at pp. 406–407.)

Nine years later, the United States Supreme Court reiterated that test in *Wisconsin v. Yoder* (1972) 406 U.S. 205 [32 L.Ed.2d 15, 92 S.Ct. 1526] (*Yoder*). At issue there was a Wisconsin law that required all children ages seven to 16 to attend school. Members of the Old Order Amish religion and

the Conservative Amish Mennonite Church, however, kept their children out of school once they completed the eighth grade. (*Id.* at pp. 208–209.) *Yoder* held that under the First Amendment's clause guaranteeing the free exercise of religion, the Amish were exempt from obeying the state law in question because their "objection to formal education beyond the eighth grade [was] firmly grounded" in their religious beliefs, and the State of Wisconsin lacked a compelling interest in applying the compulsory education law to Amish children. (406 U.S. at p. 210; see *id.* at pp. 214, 219, 234.)

But then in 1990, in *Smith, supra,* 494 U.S. 872, the high court repudiated the compelling state interest test it had used in *Sherbert, supra,* 374 U.S. 398, and in *Yoder, supra,* 406 U.S. 205. Instead, it announced that the First Amendment's right to the free exercise of religion "does not relieve an individual of the obligation to comply with a 'valid and neutral law of general applicability on the ground that the law proscribes (or prescribes) conduct that his religion prescribes (or proscribes).'" (*Smith, supra,* at p. 879.) Three years later, the court reiterated that holding in *Church of Lukumi Babalu Aye, Inc. v. Hialeah* (1993) 508 U.S. 520, 531 [124 L.Ed.2d 472, 113 S.Ct. 2217] (*Lukumi*), stating that "a law that is neutral and of general applicability need not be justified by a compelling governmental interest even if the law has the incidental effect of burdening a particular religious practice."

Thus, under the United States Supreme Court's most recent holdings, a religious objector has *no federal constitutional right* to an exemption from a neutral and valid law of general applicability on the ground that compliance with that law is contrary to the objector's religious beliefs.

Just four years ago, in *Catholic Charities of Sacramento, Inc. v. Superior Court* (2004) 32 Cal.4th 527 [10 Cal.Rptr.3d 283, 85 P.3d 67] (*Catholic Charities*), we considered the claim of a nonprofit entity affiliated with the Roman Catholic Church (Catholic Charities) that the First Amendment's guarantee of free exercise of religion exempted it from complying with a California law, the Women's Contraception Equity Act (WCEA), which required employers that provide prescription drug insurance coverage for their employees to include coverage for prescription contraceptives. In rejecting that claim, we applied the test the United States Supreme Court had adopted in its 1990 decision in *Smith, supra,* 494 U.S. 872. We explained: "The WCEA's requirements apply neutrally and generally to all employers, regardless of religious affiliation, except to those few who satisfy the statute's strict requirements for exemption on religious grounds. . . . The act also addresses a matter the state is free to regulate; it regulates the content of insurance policies for the purpose of eliminating a form of gender discrimination in health benefits. The act conflicts with Catholic Charities' religious

beliefs only incidentally, because those beliefs happen to make prescription contraceptives sinful." (*Catholic Charities, supra*, at p. 549, citation omitted.)

■ In this case, too, with respect to defendants' reliance on the First Amendment, we apply the high court's *Smith* test. California's Unruh Civil Rights Act, from which defendant physicians seek religious exemption, is "a 'valid and neutral law of general applicability' " (*Smith, supra*, 494 U.S. at p. 879). As relevant in this case, it requires business establishments to provide "full and equal accommodations, advantages, facilities, privileges, or services" to all persons notwithstanding their sexual orientation. (Civ. Code, § 51, subds. (a), (b).) Accordingly, the First Amendment's right to the free exercise of religion does not exempt defendant physicians here from conforming their conduct to the Act's antidiscrimination requirements even if compliance poses an incidental conflict with defendants' religious beliefs. (*Lukumi, supra*, 508 U.S. at p. 531; *Smith, supra*, at p. 879.)

Defendant physicians, however, insist that the high court's decision in *Smith, supra*, 494 U.S. 872, has language on "hybrid rights" that lends support to their argument that under the First Amendment they are exempt from complying with the antidiscrimination provisions of California's Unruh Civil Rights Act. The pertinent passage in *Smith* states: "The only decisions in which we have held that the First Amendment bars application of a neutral, generally applicable law to religiously motivated action have involved not the Free Exercise Clause alone, but the Free Exercise Clause in conjunction with other constitutional protections . . . ." (*Smith*, at p. 881.) But the facts in *Smith*, the court explained, did "not present such a hybrid situation." (*Id.* at p. 882.) Defendants here contend that they do have a hybrid claim, because compliance on their part with the state's Act interferes with a combination of their First Amendment rights to free speech and to freely exercise their religion. We rejected a similar hybrid claim in *Catholic Charities, supra*, 32 Cal.4th 527.

■ In that case, we explained that "[t]he high court has not, since the decision in *Smith, supra*, 494 U.S. 872, determined whether the hybrid rights theory is valid or invoked it to justify applying strict scrutiny to a free exercise claim." (*Catholic Charities, supra*, 32 Cal.4th at p. 557.) We added, however, that Justice Souter's concurring opinion in *Lukumi, supra*, 508 U.S. 520, 567, was critical of the idea that hybrid rights would give rise to a stricter level of scrutiny: " '[I]f a hybrid claim is simply one in which another constitutional right is implicated, then the hybrid exception would probably be so vast as to swallow the *Smith* rule . . . .' " (*Catholic Charities, supra*, at pp. 557–558, quoting *Lukumi, supra*, at p. 567 (conc. opn. of Souter, J.).) We also noted that the federal Court of Appeals for the Sixth Circuit had rejected as " 'completely illogical' the proposition that 'the legal standard [of review]

under the Free Exercise Clause depends on whether a free-exercise claim is coupled with other constitutional rights.' (*Kissinger v. Board of Trustees* [(1993)] 5 F.3d 177, 180 & fn. 1.)" (*Catholic Charities, supra,* at p. 558.) Nonetheless, after assuming for argument's sake that "the hybrid rights theory is not merely a misreading of *Smith, supra,* 494 U.S. 872," we concluded that Catholic Charities had "not alleged a meritorious" claim under that theory. (*Ibid.*) We also rejected the contention by Catholic Charities that requiring it to provide prescription contraceptive coverage to its employees would violate its First Amendment right to free speech "by requiring the organization to engage in symbolic speech it finds objectionable." (*Ibid.*) As we explained, "compliance with a law regulating health care benefits is not speech." (*Ibid.*)

Here, defendant physicians contend that exposing them to liability for refusing to perform the IUI medical procedure for plaintiff infringes upon their First Amendment rights to free speech and free exercise of religion. Not so. As we noted earlier, California's Unruh Civil Rights Act imposes on business establishments certain antidiscrimination obligations, thus precluding any such establishment or its agents from telling patrons that it will not comply with the Act. Notwithstanding these statutory obligations, defendant physicians remain free to voice their objections, religious or otherwise, to the Act's prohibition against sexual orientation discrimination. "For purposes of the free speech clause, simple obedience to a law that does not require one to convey a verbal or symbolic message cannot reasonably be seen as a statement of support for the law or its purpose. Such a rule would, in effect, permit each individual to choose which laws he would obey merely by declaring his agreement or opposition." (*Catholic Charities, supra,* 32 Cal.4th at pp. 558–559.)

■ Defendant physicians also perceive a form of free speech infringement flowing from plaintiff's purported efforts "to silence the doctors at trial." But the First Amendment prohibits *government* abridgment of free speech. Here, plaintiff is a private citizen. Therefore, her conduct as complained of by defendants does not fall within the ambit of the First Amendment.

Plaintiff's motion in the trial court for summary adjudication of defendant physicians' affirmative defense claiming a religious exemption from liability under California's Unruh Civil Rights Act merely sought to preclude the presentation at trial of a defense lacking any constitutional basis. In ruling on the motion, the trial court granted summary adjudication of the defense only insofar as it applied to plaintiff's claim of sexual orientation discrimination as prohibited by the Act. (See p. 1161, *post.*) Nothing in that ruling precludes defendants from later at trial offering evidence, if relevant, that their denial of

the medical treatment at issue was prompted by their religious beliefs for reasons *other* than plaintiff's sexual orientation.

## IV

We now turn to the California Constitution. As here relevant, it provides: "Free exercise and enjoyment of religion without discrimination or preference are guaranteed." (Cal. Const., art. I, § 4.)

Part III, *ante*, dealt with defendant physicians' First Amendment claim. To that federal constitutional issue, we applied the high court's test articulated in *Smith, supra,* 494 U.S. 872. That test's main inquiry is whether the law being challenged is a " 'valid and neutral law of general applicability.' " (*Id.* at p. 879.) If it is, it "need not be justified by a compelling governmental interest even if the law has the incidental effect of burdening a particular religious practice." (*Lukumi, supra,* 508 U.S. at p. 531.) That test, we noted, was a departure from the compelling state interest test that the high court had applied in *Sherbert, supra,* 374 U.S. 398, and in *Yoder, supra,* 406 U.S. 205. (See p. 1155, *ante.*)

Here, defendant physicians seek a religious exemption from a state law that is "a 'valid and neutral law of general applicability' " (*Smith, supra,* 494 U.S. at p. 879; see p. 1156, *ante*). To date, this court has not determined the appropriate standard of review for such a challenge under the *state* Constitution's guarantee of free exercise of religion. (See *Catholic Charities, supra,* 32 Cal.4th at pp. 561–562.) Because construing a state constitution is a matter left exclusively to the states, the high court's *Smith* test is not controlling here. (*Catholic Charities, supra,* at pp. 559–561.) As in *Catholic Charities*, however, this case presents no need for us to determine the appropriate test. For even under a strict scrutiny standard, defendants' claim fails.

■ Under strict scrutiny, "a law could not be applied in a manner that substantially burden[s] a religious belief or practice unless the state show[s] that the law represent[s] the least restrictive means of achieving a compelling interest . . . ." (*Catholic Charities, supra,* 32 Cal.4th at p. 562.) Presumably, for defendants to comply with the Unruh Civil Rights Act's prohibition against sexual orientation discrimination would substantially burden their religious beliefs. Yet that burden is insufficient to allow them to engage in such discrimination. The Act furthers California's compelling interest in ensuring full and equal access to medical treatment irrespective of sexual orientation, and there are no less restrictive means for the state to achieve that goal.

To avoid any conflict between their religious beliefs and the state Unruh Civil Rights Act's antidiscrimination provisions, defendant physicians can simply refuse to perform the IUI medical procedure at issue here for any patient of North Coast, the physicians' employer. Or, because they incur liability under the Act if they infringe upon the right to the "full and equal" services of North Coast's medical practice (Civ. Code, § 51, subd. (b); see *id.*, §§ 51, subd. (a), 52, subd. (a)), defendant physicians can avoid such a conflict by ensuring that every patient requiring IUI receives "full and equal" access to that medical procedure through a North Coast physician lacking defendants' religious objections.

Both defendant physicians urge this court to adopt and apply here a standard that is significantly different than strict scrutiny. They rely on this language from our state Constitution, article I, section 4: "Free exercise and enjoyment of religion without discrimination or preference are guaranteed. *This liberty of conscience does not excuse acts that are licentious or inconsistent with the peace or safety of the State.*" (Italics added.) According to defendants, the italicized language indicates that religious objectors are free to disregard a particular state law unless doing so compromises the peace or safety of the state or is licentious—situations that are not present here. Defendants also assert that our decision in *Catholic Charities* has language, italicized here, that left open the possibility of the test proposed by defendants: "A future case might lead us to choose the rule of *Sherbert, supra,* 374 U.S. 398 . . . [requiring that a state law adversely affecting religious rights satisfy strict scrutiny], the rule of *Smith, supra,* 494 U.S. 872 [recognizing no religious exemption to valid and neutral laws of general applicability], *or an as-yet unidentified rule that more precisely reflects the language and history of the California Constitution and our own understanding of its import.*" (*Catholic Charities, supra,* 32 Cal.4th at p. 562, italics added.) We reject defendants' contention.

Our statement in *Catholic Charities, supra,* 32 Cal.4th at page 562, that this court in the future might adopt some "as-yet unidentified rule" governing free exercise of religion claims under the *state* Constitution contemplated only three possible tests: (1) The strict scrutiny standard the United States Supreme Court established in *Sherbert, supra,* 374 U.S. 398, and later used in *Yoder, supra,* 406 U.S. 205; (2) the high court's subsequent test established in *Smith, supra,* 494 U.S. 872, and in *Lukumi, supra,* 508 U.S. 520, under which religious objectors' challenges to valid and neutral laws of general applicability are rejected out of hand; or (3) an *intermediate standard,* less exacting than the rigorous first option but more so than the second. Because the standard that defendants propose would exempt a religious objector from complying with a valid and neutral law of general applicability regardless of a compelling state interest supporting the law, and regardless of the absence of lesser restrictive means for furthering that compelling state interest, their

proposed standard is not an intermediate standard but rather a standard that is more stringent than strict scrutiny. Nothing in *Catholic Charities* suggests that the appropriate test for free exercise of religion claims under article I, section 4 of the California Constitution would be stricter than strict scrutiny, and we decline to adopt such a standard here.

## V

The Court of Appeal set aside the trial court's order granting plaintiff's motion for summary adjudication of affirmative defense No. 32. According to the Court of Appeal, the trial court's ruling was inconsistent with the purpose of Code of Civil Procedure section 437c, which governs motions for summary adjudication. Relevant here is that statute's subdivision (f)(1), which states: "A party may move for summary adjudication as to one or more causes of action within an action, *one or more affirmative defenses,* one or more claims for damages, or one or more issues of duty, if that party contends that the cause of action has no merit or that there is no affirmative defense thereto, or both, or that there is no merit to a claim for damages, . . . or that one or more defendants either owed or did not owe a duty to the plaintiff or plaintiffs. *A motion for summary adjudication shall be granted only if it completely disposes* of a cause of action, *an affirmative defense,* a claim for damages, or an issue of duty." (§ 437c, subd. (f)(1), italics added.) As the italicized language in the last sentence indicates, a grant of summary adjudication of an affirmative defense is proper if it "completely disposes" of that defense.

Here, in reversing the trial court's grant of plaintiff's motion for summary adjudication of affirmative defense No. 32 with respect to plaintiff's Unruh Civil Rights Act claim, the Court of Appeal noted that section 437c was added to the Code of Civil Procedure at the request of the California Judges Association, and that the statute was intended to "save court time," to "reduce the cost of litigation" and to "stop the practice of . . . adjudication of issues that do not completely dispose of a cause of action or defense."

The Court of Appeal then concluded that summary adjudication of affirmative defense No. 32 was "improper as to Dr. Brody and Dr. Fenton because it effectively preclude[d] them from presenting any evidence at trial that their refusal to perform IUI for Benitez was based on their religious beliefs regarding the propriety of performing the procedure for unmarried women," conduct that the Court of Appeal further concluded was not prohibited by the Act in 2000, the time of that refusal. The court added: "Because there is a triable issue of fact as to whether Dr. Brody and Dr. Fenton refused to perform the procedure for Benitez based on her marital status and not her sexual orientation, . . . Dr. Brody and Dr. Fenton are entitled to present

evidence that their religious beliefs prohibited them from performing IUI on *any* unmarried woman, regardless of the woman's sexual orientation."

But in granting plaintiff's motion for summary adjudication of affirmative defense No. 32, the trial court did not at all preclude defendant physicians from later offering evidence at trial of their religious grounds for refusing to perform the IUI medical procedure for plaintiff because of her marital status as an unmarried woman rather than her sexual orientation as a lesbian. In granting Benitez's motion, the trial court stated that it had merely determined that affirmative defense No. 32 lacked any basis in law as a defense to plaintiff's Unruh Civil Rights Act claim of *sexual orientation discrimination*, but that it was not precluding defendant physicians from "tell[ing] the jury what happened in this case," that is, presenting evidence that their religious beliefs prohibited them from medically inseminating an unmarried woman. This is clear from the following colloquy between the trial court and plaintiff's counsel.

Counsel for plaintiff asked the trial court: "What basis would there be for [defendant physicians to] present[] their motive to the jury if not to say it was okay that you violated Unruh because you had this religious belief?" The trial court responded that the jurors "are still going to know what the motive [was]," and that defendants "have to tell the jury what happened in this case." Plaintiff's counsel then argued that testimony about defendant physicians' religious motivation for refusing to perform the IUI medical procedure for plaintiff would be "legally irrelevant." The trial court replied: "Facts are the facts, and the jury is instructed on the law and . . . is going to follow the law." Ultimately, the trial court agreed to allow plaintiff to reassert at trial her objection to defendants presenting any evidence of religious motive to support their claim that their refusal to perform the IUI medical procedure was based on plaintiff's marital status as a single woman rather than her sexual orientation as a lesbian. Although the trial court reserved any final ruling on the matter, it added that plaintiff's position would make "an interesting argument," and that it had "a hard time envisioning how this case would be presented without telling the jury what happened."

Thus, the trial court's ruling left defendant physicians free to later offer evidence at trial that their religious objections were to participating in the medical insemination of an unmarried woman and were not based on plaintiff's sexual orientation, as her complaint alleged. The trial court's ruling simply narrowed the issues in this case by disposing of defendants' contention that their constitutional rights to free speech and the free exercise of religion exempt them from complying with the Unruh Civil Rights Act's prohibition against sexual orientation discrimination. In concluding to the contrary, the Court of Appeal erred.

## DISPOSITION

The judgment of the Court of Appeal is reversed.

George, C. J., Baxter, J., Werdegar, J., Chin, J., Moreno, J., and Corrigan, J., concurred.

**BAXTER, J.,** Concurring.—I join the majority's narrow conclusion that, on the facts of this case, defendants have no affirmative defense, based on the free exercise of religion clauses of the federal and state Constitutions, against plaintiffs' Unruh Civil Rights Act (Civ. Code, § 51) claims of discrimination on the basis of sexual orientation. With respect to the application of article I, section 4 of the California Constitution to this issue, I do not necessarily believe the state has a compelling interest in eradicating every difference in treatment based on sexual orientation (cf. *In re Marriage Cases* (2008) 43 Cal.4th 757, 875–877 [76 Cal.Rptr.3d 683, 183 P.3d 384] (conc. & dis. opn. of Baxter, J.) [sexual orientation is not suspect classification; statutory definition of marriage as between man and woman satisfies rational basis test]). However, I agree that California has a compelling interest, furthered by the Unruh Civil Rights Act, "in ensuring *full and equal access to medical treatment* irrespective of sexual orientation" (maj. opn., *ante*, at p. 1158, italics added), including a right to full medical assistance in establishing a pregnancy.

Of course, assuming that a strict scrutiny standard applies under the California Constitution, the state's interest—here represented in a statute—must be balanced, in appropriate cases, against the fundamental *constitutional* right to the free exercise of religion. I am persuaded that, in the circumstances before us, the burden imposed on this constitutional right was not sufficient to overcome the state's interest. As the majority indicates, defendants in this case, who are members of a group medical practice, can avoid any conflict between their religious beliefs and the Unruh Civil Rights Act's requirements "by ensuring that every patient requiring [intrauterine insemination] receives 'full and equal' access to that medical procedure *through a North Coast physician lacking defendants' religious objections*." (Maj. opn., *ante*, at p. 1159, italics added.)

I am not so certain this balance of competing interests would produce the same result in the case of a sole practitioner, who arguably is a "business establishment[]" for purposes of the Unruh Civil Rights Act (Civ. Code, § 51, subd. (b); see *Washington v. Blampin* (1964) 226 Cal.App.2d 604, 606–607 [38 Cal.Rptr. 235]), but who lacks the opportunity to ensure the patient's treatment by another member of the same establishment. At least where the patient could be referred with relative ease and convenience to another

practice, I question whether the state's interest in full and equal medical treatment would compel a physician in solo practice to provide a treatment to which he or she has sincere religious objections. One might well conclude that, in that situation, application of the Unruh Civil Rights Act against the doctor would not be the means " 'least restrictive' " on religion of furthering the state's legitimate interest. (Maj. opn., *ante*, at p. 1158; *Catholic Charities of Sacramento, Inc. v. Superior Court* (2004) 32 Cal.4th 527, 562 [10 Cal.Rptr.3d 283, 85 P.3d 67].)

These issues are not before us here, however, and the majority does not express any views on them. On that basis, and with that understanding, I concur in the majority's reasoning, and in its result.

Petitioners' petition for a rehearing was denied October 28, 2008.