Filed 4/17/13

CERTIFIED FOR PUBLICATION

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| MAUREEN K., <br><br> Plaintiff and Appellant, <br><br> v. <br><br> THEODORE TUSCHKA, M.D., <br><br> Defendant and Respondent. | 2d Civil No. B236150 <br> (Super. Ct. No. 56-2009-00362326) <br> (Ventura County) |

The Unruh Civil Rights Act provides a comprehensive statutory scheme to protect all persons from unlawful discrimination. A medical doctor is not immune from the broad sweep of the Act. The irony here is that appellant was in need of surgery to repair an umbilical hernia, and turned to the medical profession for help. She was turned away minutes before surgery because of a disability - she was HIV-positive. The surgery was abruptly canceled in the hospital's pre-operative room by the anesthesiologist, respondent Dr. Theodore Tuschka, after he learned from appellant's chart that she was HIV-positive and was not taking anti-retroviral (ARV) medications. Respondent refused to go forward with the surgery because of his concern for his own safety and that of the operating room staff.[1]

---

[1] We do not rely upon the evidence which, in theory, would support respondent's claim that his motivation for refusing to provide medical care was his concern for appellant's medical health. (See *infra,* pp. 6-7, standard of review.)

As we shall explain, the trial court prejudicially erred by submitting the issue of whether appellant was disabled to the jury.  A person with HIV is disabled as a matter of law.  Here there is an additional reason why appellant is disabled as a matter of law:  respondent "regarded or treated" her as a person with a disability.

Appellant's complaint against respondent alleges causes of action for disability discrimination in violation of the Unruh Civil Rights Act (Civ. Code, § 51, et seq.)[2] and violation of the Confidentiality of Medical Information Act (CMIA) (§ 56, et seq.).  She appeals from the judgment entered in respondent's favor after the trial court granted his motion for summary adjudication of the CMIA claim and the jury found that she is not disabled within the meaning of the Unruh Civil Rights Act.

The Legislature has determined that a person with HIV is disabled as a matter of law within the meaning of the Unruh Civil Rights Act.  This is not a question for the jury.  As a consequence, we reverse the judgment as to this cause of action.  However, the trial court correctly granted respondent's motion for summary adjudication of the cause of action for violation of the CMIA because respondent did not disclose any individually identifying medical information.

*Facts*

Appellant is HIV-positive but has not yet developed AIDS.  Since her diagnosis in 2006, appellant has been under the regular care of a primary care physician and an immunologist specializing in the treatment of infectious diseases.  After her diagnosis, appellant had two separate surgeries in which each of her knees were replaced.  Both surgeries were completed without incident.  In late October 2008, with the consent of her immunologist, appellant stopped taking ARV medications because she was experiencing negative side effects.

Appellant developed a painful umbilical hernia.  In January 2009, her primary care physician, Dr. Chase, referred her for hernia repair surgery.  When Dr.

---

[2] All statutory references are to the Civil Code unless otherwise stated.

2.

Chase spoke with the surgeon, Dr. Rayhrer, she informed the surgeon that appellant is HIV-positive and not currently taking ARV medications.

Appellant met with the surgeon about one week later. While giving Dr. Rayhrer her complete medical history, appellant provided a list of the medications she was then taking. There were no ARVs on the list. Dr. Rayhrer wrote in her chart that appellant had "HIV without AIDS." Dr. Rayhrer ordered several laboratory tests for appellant and scheduled her for surgery. The tests ordered by Dr. Rayhrer did not relate to appellant's HIV-positive condition and did not determine her viral load. After reviewing the test results, Dr. Rayhrer was satisfied that appellant was a suitable candidate for surgery, notwithstanding her HIV-positive status. She scheduled appellant for the surgery.[3]

On February 9, 2009, the day scheduled for her surgery, appellant arrived at the hospital and was taken to the pre-operative room where she was placed in a bed between two other patient-occupied beds that were separated by curtains. She gave the nurse a list of her medications, signed a hospital consent form and discreetly told the nurse that she was HIV-positive. The nurse was unfazed by this revelation and inserted an intravenous needle in appellant's arm.

A few minutes later, respondent appeared at appellant's bedside, fully dressed and prepared for surgery. He announced that he was going to be her anesthesiologist and began reviewing appellant's medical chart. Respondent quickly and loudly announced that appellant was HIV-positive. He commented that her chart contained no information on her viral load or T-cells and asked if she was on

---

[3] Dr. Rayhrer described this "open procedure" as requiring an incision at the "belly button, about an inch and a half or sometimes two inches long. The hernia is separated from the surrounding tissue, pushed back into place and then a patch is slid between the material popping through the hernia and the back side of the muscles of the abdominal wall. A little bit like patching a tire from the inside of the tire." The mesh patch is placed "behind the abdominal wall in a space called the preperitoneal space, which is between the muscles and a thin layer that covers the intestinal track. So it's a few millimeters actually away from the intestine[,] . . . on the inside of the muscles of the abdominal wall[,] . . . a small distance from the skin in most people . . . ."

medications. Appellant told him she was not and gave him the name of her immunologist. Respondent then told appellant that he was not going to participate in the surgery. He left the room. When he came back a few minutes later, respondent told appellant that he had reached the surgeon, Dr. Rayhrer, and that the surgery was canceled. Appellant testified that respondent explained to her "that he wanted to keep himself safe and the people that he works with safe. That it was foolish to get involved where he didn't know what [appellant's] count was, and that [the surgery] was off." On respondent's orders, the nurse removed appellant's intravenous needle and escorted her out of the room.[4]

Respondent testified that, when he understood appellant had stopped taking ARV medication prior to surgery, he left the room to telephone the surgeon. He asked whether she thought it was wise to continue with the surgery without knowing the patient's viral load, since the patient had started, and then stopped taking ARV medication. According to respondent, Dr. Rayhrer agreed the surgery should be postponed. Respondent wrote a note in appellant's hospital chart that read: "Patient with HIV positive off medications two months. Suggest workup by treating physician documenting viral loads and infectious status. Hopefully patient will be on meds or have documented nonviremic state for the safety of the operating room personnel."[5]

---

[4] Respondent's conduct toward appellant, in addition to being insensitive, may have been inconsistent with his ethical obligations. The American Medical Association's Code of Medical Ethics states, "A physician may not ethically refuse to treat a patient whose condition is within the physician's current realm of competence solely because the patient is seropositive for HIV. Persons who are seropositive should not be subjected to discrimination based on fear or prejudice." (AMA Code Med. Ethics, opn. No. 9.131.)

[5] Respondent's note is almost a "smoking gun" on this issue. (See *People v. Webb* (1999) 74 Cal.App.4th 688, 692, fn. 3 ["…something that serves as indisputable evidence or proof…."].) It fully corroborates appellant's testimony that the sole reason for the surgical cancellation was the safety of operating room personnel. At trial, respondent testified that he was concerned for the patient's health. He admitted, however, that the chart showed no such concern.

After respondent informed appellant the surgery was canceled, the nurse removed her intravenous needle, she got dressed, and was escorted from the pre-operative room to the public waiting area. Appellant testified that she was humiliated and very upset by the experience. One of the nurses working in the pre-operative room that day overheard respondent talking to appellant about her HIV-status and why she was not taking certain medications. Appellant testified that she believed other patients in the room could hear respondent's statements to her. She also testified that, as she was being escorted out of the room, another patient acknowledged her with a sympathetic gesture.

Dr. Rayhrer testified that it is not unusual for her to perform surgery on an HIV-positive patient. In every surgery, the doctors, nurses and other staff take "universal precautions" to avoid the transmission of blood borne diseases, regardless of whether the patient is known to be HIV-positive. As a general rule, Dr. Rayhrer does not ask patients about their viral load prior to surgery. She explained, "I don't feel I need to be ordering the viral load because either I'm operating on an HIV patient because it's an emergency and the patient needs the surgery no matter what their viral load is, or I'm operating on a patient that is referred to me by a primary care doctor. They're usually well managed and so I don't normally order [a test to determine the patient's viral load] as a routine." Dr. Rayhrer also testified that, had she known appellant had started and then stopped taking ARVs, she would not have scheduled appellant for surgery without further consultation with appellant's immunologist.

Expert testimony at trial showed that, when appropriate precautions are used, surgery on an HIV-positive patient is no more dangerous, for the patient or medical personnel, than is surgery on a patient who is not HIV-positive. Another expert opined that appellant had an elevated risk of infection because she had started and then stopped taking ARVs. Appellant's surgeon opined that the surgery might have been more risky for appellant because the surgeon planned to patch the hernia with surgical mesh. If the mesh became infected for some reason, the infection might have been more difficult to treat in an HIV-positive patient.

5.

*Jury Instructions and Special Verdict*

The parties filed trial briefs and requested jury instructions. Appellant's trial brief treated her disabled status as an undisputed issue. Respondent did not claim to the contrary. Appellant requested jury instructions that treated her disabled status as undisputed. For example, she requested a special instruction which stated, "A disability includes any physiological disease or medical condition that affects a body system (e.g., the immunological system) and limits a major life activity. [¶] It is established that [appellant] is a person with a disability under the Unruh Civil Rights Act, California Disabled Persons Act and California Government Code section 11135 because of her HIV."

After all parties had rested, the hospital requested a special jury instruction on the definition of the term "disability." It stated: " 'Physical disability' includes but is not limited to all of the following: [¶] (1) Having any physiological disease, disorder, condition, cosmetic disfigurement, or anatomical loss that does both of the following: [¶] (A) Affects one or more of the following body systems . . . immunological . . . ; and [¶] (B) Limits a major life activity. A 'major life activity' shall be construed broadly and includes physical, mental, and social activities and working. [¶] A physiological disease, disorder, condition, cosmetic disfigurement, or anatomical loss limits a major life activity if it makes achievement of the major life activity difficult. [¶] A person who is HIV positive has a condition that affects the immunological system."

In an unreported conference, appellant objected to the hospital's proposed special instruction. The trial court overruled the objection and instructed the jury as requested by the hospital. In addition, the jury was presented with a special verdict. The first question asked the jury, "On February 9, 2009, did [appellant] have a 'physical disability' based on her HIV status?" The jury found in favor of respondent by answering that question, "No."

*Standard of Review*

We review de novo the question of whether the trial court's instructions to the jury were correct. (*Mize-Kurzman v. Marin Community College Dist.* (2012) 202

6.

Cal.App.4th 832, 845; *Sander/Moses Productions, Inc. v. NBC Studios, Inc.* (2006) 142 Cal.App.4th 1086, 1094.)  In evaluating the contention that an instruction was improperly refused, "we view the evidence in the light most favorable to the appellant.  In such cases, we assume that the jury might have believed the evidence upon which the instruction favorable to the appellant was predicated."  (*Alcala v. Vazmar Corp.* (2008) 167 Cal.App.4th 747, 754; see also *Henderson v. Harnischfeger Corp.* (1974) 12 Cal.3d 663, 674.)

*Erroneous Instructions*

Upon request, a party in a civil case is entitled to correct, non-argumentative jury instructions on every theory of the case that is supported by substantial evidence.  (*Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 572; *Maxwell v. Powers* (1994) 22 Cal.App.4th 1596, 1607.)   The trial court has no duty to instruct on its own motion, nor is it obligated to modify proposed instructions to make them complete or correct.  (*Metcalf v. County of San Joaquin* (2008) 42 Cal.4th 1121, 1130-1131; *Fierro v. International Harvester Co.* (1982) 127 Cal.App.3d 862, 869.)  Such instructions may be rejected without the trial court's attempting to modify or correct them.  (*Harris v. Oaks Shopping Center* (1999) 70 Cal.App.4th 206, 209.)  When the trial court chooses to give an instruction, however, it must be a correct statement of the law.  If an instruction quotes only a portion of a statute, the omissions must not make the instruction, considered as a whole and in the context of the evidence, misleading.  (See, e.g., *Menchaca v. Helms Bakeries Inc.* (1968) 68 Cal.2d 535, 543 [no error in omitting from instruction final sentence of statute where omission did not render instruction misleading]; *Logacz v. Limansky* (1999) 71 Cal.App.4th 1149, 1159-1160 [in medical malpractice case, trial court erred by refusing proposed instruction on concurrent causation rather than modifying it to conform to the evidence].)

*Statutory Framework*

The Unruh Civil Rights Act protects persons with a physical disability from discrimination in public accommodations including, "advantages, facilities, privileges or services in all business establishments of every kind whatsoever."  (§ 51, subd. (a); see

also *Norton Const. Women's Care Medical Group, Inc. v. Superior Court* (2008) 44 Cal.4th 1145, 1153.)  It defines the term "disability," by incorporating the definition found in the Fair Employment & Housing Act ("FEHA"), Government Code sections 12926 and 12926.1.  (§ 51, subd. (e)(1).)  Under the FEHA definition, " 'Physical disability' includes, but is not limited to, all of the following:  [¶]  (1) Having any physiological disease, disorder, condition, cosmetic disfigurement, or anatomical loss that does both of the following:  (A) Affects one or more of the following body systems:  . . . immunological . . . . (B) Limits a major life activity."  (Gov. Code, § 12926, subd. (*l*).)  The statutory definition extends beyond persons whose disability currently limits their life activity to persons who are "regarded or treated by" an employer or other covered entity as having a disease or condition "that makes achievement of a major life activity difficult," or one "that has no present disabling effect but may become a physical disability as described" in Government Code section 12926, subdivision (*1*)(1).  (Gov. Code, § 12926, subd. (*l*)(4), (*l*)(5).)  The FEHA also includes a legislative declaration that, "Physical and mental disabilities include, but are not limited to, chronic or episodic conditions such as HIV/AIDS . . . ."  (Gov. Code, § 12926.1, subd. (c).)

*The Trial Court Erred in Submitting the Question of Appellant's*
*Disability to the Jury Because She is Disabled as a Matter of Law*

For many years, California courts have recognized the uniquely disabling nature of HIV/AIDS.  In 1989, for example, the court in *Raytheon Co. v. Fair Employment & Housing Commission* (1989) 212 Cal.App.3d 1242, described HIV as "a progressive immune system disorder" that creates for the infected person, "not simply a possibility but a tragic certainty that the condition would at some time in the future seriously impair his physical ability and ultimately kill him."  (*Id.* at pp. 1248-1249.)  More recently, the court in *Prilliman v. United Air Lines, Inc.* (1997) 53 Cal.App.4th 935, considered the disabled status of two former airline pilots suffering from AIDS to be undisputed because, "AIDS is a physical handicap" within the meaning of the FEHA.  (*Id.* at p. 947; see also *Scotch v. Art Institute of California -Orange County, Inc.* (2009) 173 Cal.App.4th 986, 1002 [HIV/AIDS is a physical disability under FEHA]; *Bell v.*

*Wells Fargo Bank, N.A.* (1998) 62 Cal.App.4th 1382 [HIV-positive bank examiner was disabled within meaning of FEHA].)

In *Bragdon v. Abbott* (1998) 524 U.S. 624 [141 L.Ed.2d 540], the United States Supreme Court held that HIV is a "physical impairment" within the meaning of the Americans with Disabilities Act (ADA), 42 U.S.C.A. § 12102(2)(A), "from the moment of infection" on, even during the "asymptomatic" phase of the disease, when the infected person may not experience any symptoms or conditions commonly associated with illness. (*Id.* at pp. 635, 637.) As the Supreme Court explained, "[I]nfection with HIV causes immediate abnormalities in a person's blood, and the infected person's white cell count continues to drop throughout the course of the disease, even when the attack is concentrated in the lymph nodes. In light of these facts, HIV infection must be regarded as a physiological disorder with a constant and detrimental effect on the infected person's hemic and lymphatic systems from the moment of infection. HIV infection satisfies the statutory and regulatory definition of a physical impairment during every stage of the disease." (*Id.* at p. 637.)

A physical impairment qualifies as a disability under the ADA only when it also "substantially limits one or more of the major life activities of [the impaired] individual." (42 U.S.C.A. § 12102(2)(A).) The court in *Bragdon v. Abbott, supra*, 524 U.S. 624, limited its analysis to the "major life activity" of bearing children, because that was the activity relied upon by the respondent. In holding that HIV substantially limited the plaintiff's ability to reproduce, the Court noted, "Given the pervasive, and invariably fatal, course of the disease, its effect on major life activities of many sorts might have been relevant to our inquiry. Respondent and a number of *amici* make arguments about HIV's profound impact on almost every phase of the infected person's life . . . . We have little doubt that had different parties brought the suit they would have maintained that an HIV infection imposes substantial limitations on other major life activities." (*Id.* at p. 637.)

Following *Bragdon,* federal courts have declined to hold that a person with HIV is disabled as a matter of law within the meaning of the ADA. Instead, the federal

courts have held that the question of whether a physical impairment constitutes a disability under the federal statute is fact-specific and must be decided on a case by case basis. (See, e.g., *Albertson's, Inc. v. Kirkingburg* (1999) 527 U.S. 555, 566 [ADA mandates that federal courts "determine the existence of disabilities on a case-by-case basis"].)

The California statute, by contrast, expressly states both that "HIV/AIDS" is a physical disability and that the FEHA definition of disability "is intended to result in broader coverage under the law of this state than under" the ADA. (§ 12926.1, subd. (c).) Moreover, California has long recognized that the FEHA protects against discrimination on the basis of a physical condition, such as high blood pressure or a heart condition, "that may handicap in the future but have no presently disabling effect." (*American National Ins. Co. v. Fair Employment & Housing Commission* (1982) 32 Cal.3d 603, 610; see also *Angell v. Peterson Tractor, Inc.*(1994) 21 Cal.App.4th 981, 987.)

Even with recent advances in treatment, HIV/AIDS remains a devastating, progressive illness for which there is no known cure. Therapies such as ARV medications may delay its progression, but nothing can permanently alleviate the many symptoms and side effects experienced by those who are living with this condition. It defies common sense to say that an incurable illness marked by the progressive and ultimately total destruction of the immune system is not an actual disability. We conclude as a matter of law that HIV is a disability within the meaning of the Unruh Civil Rights Act.

It was undisputed that appellant has HIV. As a matter of law, then, she is a disabled person within the meaning of the statute. No factual question concerning her disabled status remained for the jury to decide. The trial court erred in submitting the issue to the jury. (*Gelfo v. Lockheed Martin Corp.* (2006) 140 Cal.App.4th 34, 50.)

Appellant is disabled as a matter of law not only because she is HIV-positive, but also because it is undisputed that respondent "regarded or treated" her as a person with a disability. (Gov. Code, § 12926, subd. (*l*)(5).) The protection of the Unruh Civil Rights Act extends both to people who are currently living with a physical disability

that limits a life activity and to those who are regarded by others as living with such a disability. As the court noted in *Gelfo v. Lockheed Martin Corp., supra,* 140 Cal.App.4th at page 53: "Both the policy and language of the statute offer protection to a person who is not actually disabled, but is wrongly perceived to be. The statute's plain language leads to the conclusion that the 'regarded as' definition casts a broader net and protects *any* individual 'regarded' or 'treated' by an employer 'as having, or having had, any physical condition that makes achievement of a major life activity difficult' or may do so in the future." Thus, even an HIV positive person who is outwardly asymptomatic is protected by the Unruh Civil Rights Act.

Here, the undisputed evidence demonstrated that respondent regarded appellant as having a disability. Respondent testified that he hesitated to proceed with the surgery only after he learned that appellant is HIV positive. He believed her HIV positive status made her a more dangerous patient for the operating room staff to treat. As a matter of law, then, appellant qualified as a disabled person within the meaning of Government Code section 12926, subdivision (*l*)(5).

*The Error Was Not Waived or Invited*

Appellant has not waived appellate review of her contention that the trial court erred in its instruction to the jury. First, she objected to the hospital's proposed instruction. Second, in a civil case, a party is deemed to have objected to an erroneous jury instruction; there is no waiver for failure to object. (*Huffman v. Interstate Brands Corp.* (2004) 121 Cal.App.4th 679, 705.) Code of Civil Procedure section 647 provides that the trial court's decisions to give, refuse or modify proposed jury instructions "are deemed to have been excepted to." (See also *Mock v. Michigan Millers Mutual Ins. Co.* (1992) 4 Cal.App.4th 306, 333-334.) "[W]hen a trial court gives a jury instruction which is prejudicially erroneous as given, i.e., which is an incorrect statement of the law, the party harmed by that instruction need not have objected to the instruction or proposed a correct instruction of his own in order to preserve the right to complain of the erroneous instruction on appeal." (*Susman v. BMW of North America, Inc.* (1994) 23 Cal.App.4th 1, 9.)

11.

Nor was the error invited. The doctrine of invited error provides that a party may not assert as a ground for reversal an error that he or she induced the trial court to commit. (*Norgart v. Upjohn Co.* (1999) 21 Cal.4th 383, 403; *Huffman v. Interstate Brands Corp., supra,* 121 Cal.App.4th at p. 706.) "At bottom, the doctrine rests on the purpose of the principle, which prevents a party from misleading the trial court and then profiting therefrom in the appellate court." (*Norgart, supra,* 21 Cal.4th at p. 403.) Here, appellant did nothing to convince the trial court to give an incorrect jury instruction. To the contrary, her proposed instruction would have correctly informed the jury that she is disabled as a matter of law. The doctrine of invited error does not apply.

*The Error was Prejudicial*

"[T]here is no rule of automatic reversal or 'inherent' prejudice applicable to any category of civil instructional error, whether of commission or omission. A judgment may not be reversed for instructional error in a civil case 'unless, after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice.' (Cal. Const., art. VI, § 13.)" (*Soule v. General Motors Corp., supra,* 8 Cal.4th at p. 580.) Instructional error is prejudicial where it seems probable that the error affected the verdict. (*LeMons v. Regents of University of California* (1978) 21 Cal.3d 869, 875.) The determination of prejudice "depends heavily on the particular nature of the error, including its natural and probable effect on a party's ability to place his full case before the jury. [¶] . . . [W]hen deciding whether an error of instructional omission was prejudicial, the court must also evaluate (1) the state of the evidence, (2) the effect of other instructions, (3) the effect of counsel's arguments, and (4) any indications by the jury itself that it was misled." (*Soule v. General Motors Corp., supra,* 8 Cal.4th at pp. 580-581.)

The objective of the Unruh Civil Rights Act is to prohibit unreasonable, arbitrary or invidious discrimination on the basis of specified classifications including physical disability. (*Howe v. Bank of America, N.A.* (2009) 179 Cal.App.4th 1443, 1450.) Because respondent's decision was based on unlawful discrimination, as opposed to concern for the patient, the laudable objective of the Unruh Civil Rights Act would not

12.

be served by affirmance. Here, the "state of the evidence" supports appellant's theory of the case. Other instructions did not allow the jury to properly evaluate the case. In fact, the other instructions affirmatively mislead the jury. Defense counsel argued that appellant had to prove that her disability "limits a major life activity." Appellant's counsel argued to the contrary, but appellant has no such burden. The jury was misled and reversal is required. (*Soule v. General Motors Corp.*, *supra*, 8 Cal.4th at pp. 580-581.)

*Violation of the CMIA*

Appellant alleged that respondent violated the Confidentiality of Medical Information Act (CMIA) (§ 56 et. seq.), because as he reviewed her chart in the pre-operative room, he stated, loudly enough for other patients to hear, that she is HIV positive. The trial court granted respondent's motion for summary adjudication of this claim on the grounds that respondent did not disclose any identifying medical information about appellant. We agree and therefore affirm the judgment on this cause of action.

Because an appeal from a motion for summary adjudication raises only questions of law, we independently analyze the supporting and opposing papers to determine whether there is a triable issue as to any material fact. In doing so, we view the evidence in the light most favorable to the non-moving party, drawing all reasonable inferences in favor of that party. (*Wilson v. 21st Century Ins. Co.* (2007) 42 Cal.4th 713, 716-717; *Binder v. Aetna Life Ins. Co.* (1999) 75 Cal.App.4th 832, 840.) It was respondent's burden to demonstrate that appellant could not establish one or more elements of her cause of action. (*Lopez v. Superior Court* (1996) 45 Cal.App.4th 705, 713-714.) Appellant then had the burden to present admissible evidence showing that a triable issue of material fact exists. (*Campanano v. California Medical Center* (1995) 38 Cal.App.4th 1322,1 327.) To rebut the contention that appellant has no evidence to support her factual allegations, appellant may not rely upon allegations in the pleadings, but must instead "set forth the specific facts showing that a triable issue of material fact

13.

exists . . . ."  (Code Civ. Proc., § 437c, subd. (o)(2); *Campanano, supra,* 38 Cal.App.4th at p. 1327.)

Section 56.10 prohibits a provider of health care from disclosing medical information regarding a patient without written authorization from that patient.  (§ 56.10, subd. (a).)  Medical information is "any individually identifiable information, in electronic or physical form, in possession of or derived from a provider of health care . . . , regarding a patient's medical history, mental or physical condition, or treatment.  'Individually identifiable' means that the medical information includes or contains any element of personal identifying information sufficient to allow identification of the individual, such as the patient's name, address, electronic mail address, telephone number, or social security number, or other information that, alone or in combination with other publicly available information, reveals the individual's identity."  (§ 56.05, subd. (g).)

The trial court concluded respondent was entitled to judgment as a matter of law on the CMIA claim because there was no evidence that he disclosed any individually identifiable medical information about appellant.  The undisputed evidence was that respondent did not use appellant's full name, or disclose any of the other identifying information listed in the statute, when he spoke with her.  While other patients in the room might have overheard respondent say that someone was HIV positive, there was no evidence that other patients would have been able to see appellant at that moment or to connect the statement to her through some other means.  One witness testified that she overheard the conversation, but did not see which patient was involved.  Appellant testified that, as she was being escorted from the pre-operative room several minutes after the conversation ended, a patient gave her a sympathetic nod.  But nothing connects that gesture with respondent's statement.  Appellant described herself as having been very upset and crying as she left the room.  The patient's nod could just as likely have been a reaction to appellant's obvious distress as to any medical information she may have overheard.

14.

The evidence appellant submitted in opposition to the motion for summary adjudication was not sufficient to raise a triable issue of fact on the CMIA claim. Respondent was entitled to summary adjudication.

*Conclusion*

An HIV patient's viral load or T-cell count is not determinative of operating room safety, as long as reasonable universal precautions are taken. No medical doctor should have liability for refusing to perform a procedure that he or she believes will harm the patient. That is not what happened here. Here, an HIV-positive patient was denied medically necessary surgery because an anesthesiologist unreasonably feared for his own safety and that of the operating room staff. The denial was based on her HIV-positive status and was a violation of the Unruh Civil Rights Act.

The judgment on appellant's cause of action for violation of the Unruh Civil Rights Act is reversed. In all other respects, the judgment is affirmed. Appellant shall recover her costs on appeal.

CERTIFIED FOR PUBLICATION


YEGAN, J.

We concur:



GILBERT, P.J.



PERREN, J.


15.

Kent M. Kellegrew, Rebecca Riley, Judges

Superior Court County of Ventura

_____


      Arnold & Porter; Brian K. Condon, Kelly Welchans and Elizabeth S. St. John.  Arnold & Porter, Sean M. Selegue, for Appellant.


      Mark B. Connelly, Stephan A. Bowen; Hall, Hieatt & Connelly, for Respondent.