******************************************************

The "officially released" date that appears near the beginning of an opinion is the date the opinion will be published in the Connecticut Law Journal or the date it is released as a slip opinion. The operative date for the beginning of all time periods for the filing of postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying an opinion that appear in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced or distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# INTEGRIS INSURANCE COMPANY *v.*
# NARENDRA B. TOHAN
# (AC 47222)

Alvord, Elgo and Moll, Js.

*Syllabus*

The defendant physician, a reproductive endocrinologist, appealed from the trial court's summary judgment for the plaintiff insurance company in its action seeking a declaratory judgment as to its duty to defend and indemnify the defendant in a separate civil negligence action. In the civil negligence action, the plaintiffs, K and R, alleged, inter alia, that the defendant was negligent in the provision of professional services, having discovered through genetic testing that the defendant used his own sperm when he performed in vitro fertilization (IVF) procedures for their parents, without having informed the parents of his conduct. The defendant claimed, inter alia, that the court improperly concluded that all of the allegations in the civil negligence action fell within exclusions to coverage in the insurance policy issued to him by the plaintiff. *Held*:

The trial court properly concluded that the civil negligence action contained an allegation that potentially fell within the coverage provided by the insurance policy issued by the plaintiff, as the first count of the civil negligence action contained allegations that concern professional services provided by the defendant, as that term was used in the policy.

The trial court improperly determined that the intentional conduct exclusion to coverage in the insurance policy clearly and unambiguously applied to every allegation in the civil negligence action, as the first count in that action was beyond the scope of the intentional conduct exclusion because the count specifically alleged, inter alia, that the defendant inadvertently and "negligently" used his sperm that contained a genetic disease when providing IVF services to K's parents, causing the injuries K sustained.

The trial court improperly determined that the sexual conduct exclusion to coverage in the insurance policy applied clearly and unambiguously to every claim set forth in the civil negligence action, as the plaintiff failed to demonstrate that the sexual conduct exclusion applied to every negligence allegation set forth therein, including the allegation that the defendant negligently utilized sperm that contained a genetic disease when providing IVF services, a claim that is not sexual in nature.

Argued October 6, 2025—officially released April 7, 2026

*Procedural History*

Action seeking, inter alia, a declaratory judgment determining whether the plaintiff had a duty to defend and indemnify the defendant in a separate negligence

action for alleged medical misconduct, brought to the Superior Court in the judicial district of Hartford, where the court, *S. Connors, J.*, granted the plaintiff's motion for summary judgment on the second count of the amended complaint and on the counterclaim; thereafter, the court, *Klau, J.*, granted the plaintiff's amended motion for final judgment and rendered judgment thereon, from which the defendant appealed to this court. *Reversed in part*; *judgment directed*.

*Neal L. Moskow*, for the appellant (defendant).

*Eugene A. Cooney*, for the appellee (plaintiff).

*Opinion*

ELGO, J. In this declaratory action regarding an insurer's duty to defend, the defendant, Narendra B. Tohan, appeals from the summary judgment rendered by the trial court in favor of the plaintiff, Integris Insurance Company. This appeal presents two principal issues for our resolution. We first consider whether the court properly concluded that the underlying complaint contained an allegation that potentially fell within the scope of the medical professional liability insurance policy at issue. We then consider whether the court properly concluded that the plaintiff met its burden of establishing that two exclusions to coverage clearly and unambiguously applied to every allegation of that complaint. We conclude that the latter determination was improper and, accordingly, reverse in part the judgment of the trial court.[1]

The record, viewed in the light most favorable to the defendant; see *Martinelli* v. *Fusi*, 290 Conn. 347, 350, 963 A.2d 640 (2009); reveals the following facts and procedural history. The plaintiff is a medical professional liability insurer licensed to transact business in this state. The defendant is a physician licensed by the state of Connecticut. At all relevant times, the defendant maintained a

---

[1] In light of that conclusion, we do not consider the defendant's ancillary contention that the court improperly rejected his breach of contract counterclaim and his special defense of estoppel.

"Physicians & Surgeons Professional Liability Claims Made" insurance policy with the plaintiff (policy) that contained a retroactive date of October 1, 1984, and an extended reporting period endorsement, which permitted the reporting of claims for an indefinite period after the term of the policy.

In 2019, Kayla Suprynowicz and Reilly Flaherty (civil action plaintiffs),[2] who were strangers for most of their lives, discovered through a genetic testing company that they are half siblings. See *Suprynowicz* v. *Tohan*, 351 Conn. 75, 76, 328 A.3d 646 (2025). As our Supreme Court recently recounted, the civil action plaintiffs, "who are both in their thirties, were conceived through [in vitro fertilization (IVF)]. The defendant is the reproductive endocrinologist who performed the IVF procedures for the [civil action plaintiffs'] respective parents. . . . Unbeknownst to [the parents], the defendant [allegedly] used his own sperm in the IVF procedures." (Footnote omitted.) Id., 78. After she became pregnant, Kayla's mother "was informed that her pregnancy was the result of 'mixed sperm.'" Id. On April 1, 2021, the civil action plaintiffs commenced a civil action against the defendant (civil action). Their complaint contained six counts and alleged negligence, fraudulent concealment, and violations of the Connecticut Unfair Trade Practices Act (CUTPA), General Statutes § 42-110a et seq.[3] It is undisputed that those claims were brought and reported to the plaintiff while the policy's extended reporting period endorsement was in effect.

Weeks later, the plaintiff sent the defendant a certified letter dated April 20, 2021 (reservation of rights

[2] For clarity, we refer to Kayla Suprynowicz and Reilly Flaherty individually by first name and collectively as the civil action plaintiffs in this opinion.

[3] The plaintiff in the present case appended a copy of the civil action plaintiffs' March 31, 2021 complaint as an exhibit to its motion for summary judgment. See generally *Community Action for Greater Middlesex County, Inc.* v. *American Alliance Ins. Co.,* 254 Conn. 387, 395, 757 A.2d 1074 (2000) ("[t]he question of whether an insurer has a duty to defend . . . is to be determined by comparing the allegations of [the underlying] complaint with the terms of the insurance policy").

letter). In that letter, Maureen Rodgers, a senior claims account executive with the plaintiff, stated that the plaintiff had reviewed the allegations of the civil action plaintiffs and had concluded that "some or all of the claims brought against you in [the civil action] are NOT COVERED by the [p]olicy. For this reason, we will be providing a defense to you in [the civil action] under a FULL RESERVATION OF OUR RIGHTS to decline payment under the policy for any damages that might be awarded." Rodgers proceeded to recite the pertinent allegations of the complaint in the civil action and certain provisions of the policy, and then stated: "Our review of the allegations in the [civil action] indicates that some or all of the allegations are NOT COVERED under . . . the [p]olicy and are additionally or alternatively EXCLUDED FROM COVERAGE under one or more of the exclusions in the [p]olicy . . . . In particular, we refer to those claims that are predicated in whole or in part on the contention that you substituted your sperm for that of the intended sperm donor. Any damages arising directly or indirectly from such actions (1) would NOT be damages arising out of a 'medical incident' and would thus be outside the coverage of the [p]olicy, and (2) would be damages EXCLUDED from coverage under one or all of the exclusions cited above. For the same reasons, claims of fraudulent concealment and violations of [CUTPA] are not 'medical incidents' covered under the [p]olicy and are excluded from the coverage of the [p]olicy under one or all of the referenced exclusions."

Rodgers then encouraged the defendant to obtain separate legal counsel "[b]ecause of the possibility that damages awarded in [the civil action] may not be covered under the [p]olicy or may exceed your [l]imits of [l]iability . . . ." After informing the defendant that the plaintiff had retained Attorney Sally O. Hagerty to represent him in the civil action, Rodgers stated: "We remind you once again that this defense is provided under a FULL RESERVATION OF OUR RIGHTS under the policy. Our rights include, but are not limited to the right to seek judicial determinations of whether any damages

that might be awarded in the [civil action] are or are not covered under the [p]olicy and/or whether we are entitled to a rescission of the [policy]."[4]

On April 30, 2021, the plaintiff commenced this declaratory action against the defendant, which concerns the plaintiff's duty to defend the defendant against allegations that, in the course of providing IVF services, he improperly mixed his own sperm with that of Gary Suprynowicz and Brian Flaherty "to create the embryo[s] which became" the civil action plaintiffs, as alleged in the civil action. The plaintiff's operative complaint contains two counts. In count one, the plaintiff alleged that it was entitled to a rescission of the policy due to material misrepresentations made by the defendant in his application for insurance coverage. In count two, the plaintiff sought, inter alia, a declaration that "[t]he actions of the defendant as described in the [civil action] are not 'medical incidents' as defined in the policy," that the "injuries or damages" claimed by the civil action plaintiffs were excluded from coverage under the policy, that "it is against the public policy of the state of Connecticut to insure against damages caused by the conduct with which the defendant is charged in the [civil action]," and that the plaintiff "is under no obligation to provide a defense to the defendant" in the civil action.

On March 30, 2022, the defendant filed an answer, a special defense, and a two count counterclaim. In his special defense, the defendant alleged that the plaintiff was estopped from bringing the declaratory action by virtue of its written promise to provide a defense to him in the civil action, as memorialized in the reservation of rights letter. The defendant's counterclaim sounded in contract and alleged that the plaintiff breached both the policy and the plaintiff's written agreement to provide a defense in the civil action. On April 29, 2022, the plaintiff filed an answer to that counterclaim and a reply to the defendant's special defense, in which it denied the

[4] Attorney Hagerty filed an appearance on behalf of the defendant in the civil action on May 13, 2021.

allegations contained therein in all material respects. On that date, the plaintiff also filed a certificate of closed pleadings and requested a court trial.

On July 29, 2022, the plaintiff filed a motion for summary judgment on count two of its operative complaint, the defendant's special defense, and the defendant's counterclaim, claiming that no genuine issues of material fact existed and that it was entitled to judgment as a matter of law. That motion was accompanied by a memorandum of law and several exhibits.[5] On December 23, 2022, the defendant filed an objection to the motion for summary judgment and two exhibits.[6] The plaintiff filed a reply memorandum on January 9, 2023. The court held a hearing on the motion for summary judgment on July 25, 2023.

In its subsequent memorandum of decision, the court first rejected the plaintiff's claim that the civil action plaintiffs had not alleged injuries that resulted from a medical incident and, thus, were beyond the scope of the coverage provided by the policy. The court then concluded that all of the allegations in the civil action fell within both the sexual conduct exclusion contained in §III. A. 10. of the policy and the intentional conduct exclusion contained in §III. A. 12. Lastly, the court concluded that the defendant had failed to raise a genuine issue of material fact regarding either his special defense of estoppel or his breach of contract counterclaim. The court thus rendered summary judgment in favor of the plaintiff on

---

[5] The plaintiff's exhibits were (1) the March 31, 2021 complaint from the civil action, (2) the sworn affidavit of Garrett Cronin, Vice President of Underwriting and Member Services for the plaintiff, to which a true and accurate copy of the policy was appended, (3) an uncertified copy of a portion of the insurance policy at issue in *St. Paul Fire & Marine Ins. Co.* v. *Shernow*, 222 Conn. 823, 610 A.2d 1281 (1992), culled from the appellate record of that appeal, and (4) five unreported cases of the Superior Court.

[6] The exhibits submitted by the defendant were (1) a copy of the reservation of rights letter and (2) an article in a medical journal. See S. Friedman, "Artificial Insemination with Donor Semen Mixed with Semen of the Infertile Husband," 33 Fertility and Sterility 125 (1980).

count two of the operative complaint, the defendant's special defense, and the defendant's counterclaim.

The plaintiff subsequently filed a motion for entry of final judgment with the court. In that motion, the plaintiff maintained that, in light of the summary judgment rendered in favor of the plaintiff on count two of the operative complaint, the defendant's special defense, and the defendant's counterclaim, the rescission claim set forth in count one of its complaint was "moot and no longer provides any ground for practical relief." On December 3, 2023, the court granted the plaintiff's motion and rendered judgment accordingly. From that judgment, the defendant now appeals.[7]

We begin by noting the well established standard that governs our review of a trial court's decision to grant a motion for summary judgment. "In seeking summary judgment, it is the movant who has the burden of showing the nonexistence of any issue of fact. . . . [T]he moving party for summary judgment has the burden of showing the absence of any genuine issue as to all the material facts, which, under applicable principles of substantive law, entitle[s] him to a judgment as a matter of law. The courts hold the movant to a strict standard. To satisfy his burden the movant must make a showing that it is quite clear what the truth is, and that excludes any real doubt as to the existence of any genuine issue of material fact. . . . As the burden of proof is on the movant, the evidence must be viewed in the light most favorable to the opponent. . . . When documents submitted in support of a motion for summary judgment fail to establish that there is no genuine issue of material fact, the nonmoving party has no obligation to submit documents establishing the existence of such an issue. . . . Once the moving party has met its burden, however, the opposing party must present evidence that demonstrates the existence of some disputed factual issue." (Internal quotation marks omitted.) *Fiano* v. *Old Saybrook Fire Co. No. 1, Inc.*, 332

[7] In this appeal, neither party challenges the propriety of the court's dismissal of count one of the plaintiff's complaint.

Conn. 93, 101, 209 A.3d 629 (2019). Whether the trial court properly rendered summary judgment in favor of the plaintiff is a question of law subject to our plenary review. See *Nash Street, LLC* v. *Main Street America Assurance Co.*, 337 Conn. 1, 8, 251 A.3d 600 (2020).

"Our standard of review for interpreting insurance policies is [also] well settled. The construction of an insurance policy presents a question of law that we review de novo. . . . When construing an insurance policy, we look at the [policy] as a whole, consider all relevant portions together and, if possible, give operative effect to every provision in order to reach a reasonable overall result. . . . Insurance policies are interpreted based on the same rules that govern the interpretation of contracts. . . . In accordance with those rules, [t]he determinative question is the intent of the parties . . . . If the terms of the policy are clear and unambiguous, then the language, from which the intention of the parties is to be deduced, must be accorded its natural and ordinary meaning. . . . In determining whether the terms of an insurance policy are clear and unambiguous, [a] court will not torture words to import ambiguity where the ordinary meaning leaves no room for ambiguity . . . . Similarly, any ambiguity in a contract must emanate from the language used in the contract rather than from one party's subjective perception of the terms. . . . As with contracts generally, a provision in an insurance policy is ambiguous when it is reasonably susceptible to more than one reading. . . . Under those circumstances, any ambiguity in the terms of an insurance policy must be construed in favor of the insured . . . .

"The question of whether an insurer has a duty to defend its insured is purely a question of law . . . . An insurer's duty to defend is determined by reference to the allegations contained in the [underlying] complaint. . . . The duty to defend does not depend on whether the injured party will successfully maintain a cause of action against the insured but on whether [the complaint] stated facts which bring the injury within the coverage. . . . If

an allegation of the complaint falls even possibly within the coverage, then the insurance company must defend the insured. . . . That being said, an insurer has a duty to defend only if the underlying complaint *reasonably* alleges an injury that is covered by the policy. . . . [W]e will not predicate the duty to defend on a reading of the complaint that is . . . conceivable but tortured and unreasonable. . . . There is also no duty to defend if the complaint alleges a liability which the policy does not cover . . . .

"To prevail on a motion for summary judgment on a claim for breach of the duty to defend, an insurer must establish that there is no genuine issue of material fact either that no allegation of the underlying complaint falls even possibly within the scope of the insuring agreement or, even if it might, that any claim based on such an allegation is excluded from coverage under an applicable policy exclusion. In presenting countervailing proof, the insurer . . . is necessarily limited to the provisions of the subject insurance policy and the allegations of the underlying complaint. Therefore, it is only entitled to prevail under a policy exclusion if the allegations of the complaint clearly and unambiguously establish the applicability of the exclusion to each and every claim for which there might otherwise be coverage under the policy.

"An insured, in turn, may rebut an insurer's claim that it has no duty to defend him in the light of an applicable policy exclusion by showing that at least one of his allegations, as pleaded states a claim that falls even possibly outside the scope of the exclusion or within an exception to that exclusion. Unless the allegations of any such underlying claim fall so clearly and unambiguously within a policy exclusion as to eliminate any possible coverage, the insurer must provide a defense to its insured."[8] (Citations omitted; emphasis in original;

---

[8] In its principal appellate brief, the plaintiff asserts, as it did at oral argument on its motion for summary judgment before the trial court, that the defendant, as the insured party, "bears the burden of proving in the first instance that the damages claimed in the underlying action

internal quotation marks omitted.) *Stewart* v. *Old Republic National Title Ins. Co.*, 218 Conn. App. 226, 239–41, 291 A.3d 1051 (2023).

I

We first consider the question of whether the court properly concluded that the complaint in the civil action contained an allegation that potentially fell within the scope of the policy. As our Supreme Court has explained, "[a]n insurer's duty to defend is triggered if at least one allegation of the complaint falls even *possibly* within the coverage." (Emphasis in original; internal quotation marks omitted.) *Capstone Building Corp.* v. *American Motorists Ins. Co.*, 308 Conn. 760, 805, 67 A.3d 961 (2013). On appeal, the plaintiff claims that none of the injuries alleged by the civil action plaintiffs arises out of "professional services," as that term is used in the policy.[9] We disagree.

"[T]he question of whether an insurer has a duty to defend its insured is purely a question of law, which is to be determined by comparing the allegations of [the] complaint with the terms of the insurance policy." (Internal

are within the insuring agreement of the policy. If the insured carries that burden, the burden then switches to the insurer to prove that the damages are within any policy exclusions." When an insurance coverage dispute is litigated at trial, that is an accurate statement of the respective burdens of the insurer and the insured. See, e.g., *Nationwide Mutual Ins. Co.* v. *Pasiak*, 327 Conn. 225, 239, 173 A.3d 888 (2017). That burden shifting framework nevertheless has no application in the summary judgment context when an insurer is the moving party. As this court has observed, "to prevail on its own motion for summary judgment . . . for a declaratory judgment that it has no duty to defend in the underlying action, the insurer must establish that there is no genuine issue of material fact *either* that no allegation of the underlying complaint falls even possibly within the scope of the insuring agreement *or*, even if it might, that any claim based on such an allegation is excluded from coverage under an applicable policy exclusion." (Emphasis added.) *Lancia* v. *State National Ins. Co.,* 134 Conn. App. 682, 691, 41 A.3d 308, cert. denied, 305 Conn. 904, 44 A.3d 181 (2012).

[9] The plaintiff has raised this claim as an alternate ground of affirmance. Because it pertains to the applicability of the policy in question, we address that threshold question before considering whether any exclusions to the policy apply.

quotation marks omitted.) *Misiti, LLC* v. *Travelers Property Casualty Co. of America*, 308 Conn. 146, 154, 61 A.3d 485 (2013); see also *Stewart* v. *Old Republic National Title Ins. Co.*, supra, 218 Conn. App. 255 n.9 ("when determining an insurer's duty to defend, we must look to the allegations within the complaint made *by a third party against the insured*" (emphasis in original)). In the present case, §I. A. of the policy provides in relevant part that the plaintiff "will pay on behalf of the individual named in the declarations as an insured all sums that such insured shall become legally obligated to pay as damages because of any claim or suit first made and first reported by such insured to the [plaintiff] during the policy period or, where applicable, the automatic extended reporting period as a result of an alleged or actual *injury to any person arising out of a medical incident* occurring on or after the insured's retroactive date and before the expiration or termination of the policy period. . . ." (Emphasis altered.) The policy defines the term "Medical Incident" in relevant part as "any act or omission in the furnishing of professional services. . . ." (Emphasis omitted.) The policy defines "Professional Services" in relevant part as "any professional medical services within the customary scope of the insured's practice specialty or classification . . . ." The policy further obligates the plaintiff, among other things, to "defend the insured against any claim or suit which includes . . . allegations of professional negligence for which coverage is provided under this policy." (Emphasis omitted.)

We now compare those policy provisions to the allegations of the complaint in the civil action. For purposes of the present analysis, our focus is on the first count of that complaint, which alleges negligence on the part of the defendant.[10] In that count, the civil action plaintiffs allege, inter alia, that Kayla's parents "had been treating

---

[10] In its memorandum of law in support of its motion for summary judgment, the plaintiff averred that "[t]he facts and legal claims alleged by [Riley in the underlying complaint] are identical in substance" to those alleged by Kayla. In its appellate brief before this court, the plaintiff likewise notes that "[s]imilar, although more sparse, allegations are made

with [the defendant] in his professional capacity, in their efforts to become pregnant"; that "[p]rior to the pregnancy, they were not advised that the sperm would be anything but [Gary] Suprynowicz's sperm"; that the defendant "negligently . . . mixed his sperm with [Gary] Suprynowicz's sperm to impregnate" her mother; that the defendant negligently "failed to offer [Kayla's parents] the choice of sperm donor"; and that, "after she became pregnant, [Kayla's] mother was advised that the pregnancy was the result of 'mixed sperm.'"

Mindful of the procedural posture of this case, which obligates us to construe the allegations of the complaint and other summary judgment materials in a light most favorable to the defendant; see *Panaro* v. *Electrolux Corp.*, 208 Conn. 589, 591, 545 A.2d 1086 (1988); *Dorfman* v. *Liberty Mutual Fire Ins. Co.*, 227 Conn. App. 347, 391 n.27, 322 A.3d 331 (2024), cert. denied, 351 Conn. 907, 330 A.3d 881, and cert. denied, 351 Conn. 907, 330 A.3d 882 (2025); we conclude that those allegations implicate the plaintiff's duty to defend under the policy. It is undisputed that the defendant is a reproductive endocrinologist who provided fertility services to Kayla's parents using IVF procedures. See *Suprynowicz* v. *Tohan*, supra, 351 Conn. 78. Moreover, as the civil action plaintiffs expressly allege in their complaint, Kayla's parents were treated by the defendant "in his

by [Riley in the underlying complaint]" as those alleged with respect to Kayla, with the exception of the allegation that she inherited a genetic disease from the defendant.

Our review of the underlying complaint confirms the accuracy of those representations. The negligence counts pertaining to Kayla and Riley, respectively, both allege that the defendant provided fertility services to their parents and that, in so doing, the defendant negligently utilized his own sperm. The fraudulent concealment counts pertaining to Kayla and Riley both allege that the defendant fraudulently concealed the fact that he had "improperly mixed his own sperm" and "improperly replaced" the sperm of Gary Suprynowicz and Brian Flaherty, respectively, with his own while providing fertility services to their parents. Given the similarly of those allegations, and the plaintiff's averment that the facts and legal claims of Kayla and Riley in the underlying complaint are identical in substance, it is unnecessary to discuss the counts pertaining to Riley separately in this opinion.

professional capacity, in their efforts to become pregnant." Providing IVF services to Kayla's parents plainly is within the customary scope of the defendant's practice specialty and thus constitutes "professional services" as that term is defined in the policy.

The fact that the defendant may have negligently used his own sperm while providing those professional services, as the civil action plaintiffs allege in their complaint, does not alter that conclusion. A decision of the United States District Court for the Eastern District of Virginia is instructive in this regard. Like the present case, *St. Paul Fire & Marine Ins. Co.* v. *Jacobson*, 826 F. Supp. 155, 158 (E.D. Va. 1993), aff'd, 48 F.3d 778 (4th Cir. 1995), involved a declaratory action brought by a medical professional liability insurer against an insured fertility specialist who was named as a defendant in various civil actions seeking tort damages due to his "fraudulent and unauthorized use of his own semen in connection with the artificial insemination of the female patients . . . ." On cross motions for summary judgment, the court considered whether the defendant's alleged misconduct in inseminating patients with his own sperm fell within the policy's coverage, which expressly covered claims arising from the defendant's provision of "professional services." (Internal quotation marks omitted.) Id., 160. The court stated: "To determine whether an insured doctor has engaged in a professional service, it is well established that courts must look to the nature of the insured's act or conduct, not to the insured's title. Equally well established is that an insured's act, to constitute a professional service, must be such as exacts the use or application of special learning or attainments of some kind. Relying on this definition, [the plaintiff insurer] argues that [the defendant's] actions in producing sperm, i.e., masturbation, and acting as a sperm donor for the plaintiffs in the underlying actions do not constitute professional services. [B]y focusing on the production of semen, [the plaintiff insurer] has missed the mark. The professional service at issue is not [the defendant's] production of sperm. It is, instead, the fraudulent use of his sperm to inseminate his patients. The underlying

civil actions make this unmistakably clear. . . . [The defendant's] fraudulent artificial insemination of his patients with his own sperm involved the provision of professional, medical services requiring special skill and knowledge. . . . In this case, it is the operation itself, i.e., the insemination (and, ironically, its success), that is the proximate cause of the harms alleged in the underlying civil actions. As a result, the [plaintiff's] policy extends coverage to claims arising from [the defendant's] misconduct." (Citations omitted; footnotes omitted; internal quotation marks omitted.) Id., 160–62. That logic applies equally in the present case.[11]

In light of the foregoing, we conclude that, construed in the light most favorable to the defendant; see *Panaro* v. *Electrolux Corp.*, supra, 208 Conn. 591; the first count of the underlying complaint contains allegations that concern professional services provided by the defendant, as that term is used in the policy. For that reason, the court properly concluded that the civil action contained an allegation that potentially fell within the coverage

[11] In its appellate brief, the plaintiff devotes significant discussion to *St. Paul Fire & Marine Ins. Co.* v. *Shernow*, 222 Conn. 823, 610 A.2d 1281 (1992), which, it argues, "should be emphatically overruled." (Emphasis omitted.) *Shernow* is inapposite to the present case, as it concerned a civil action brought by a patient for injuries sustained "when a dentist, in the course of treatment, sexually assaulted her . . . ." Id., 824. Unlike *Shernow*, the present case involves a civil action brought not by the defendant's patients, but rather their children, stemming from the defendant's allegedly negligent and fraudulent acts when performing IVF services. In addition, their complaint does not allege sexual assault, nor does it contain any reference to "sex" or "sexual." Accordingly, the court's holding in *Shernow* that, "[w]hen the medically negligent procedure is so inextricably intertwined and inseparable from the intentional conduct that *serves as the basis for the separate claim of a sexual assault*, we join with those jurisdictions that conclude that professional liability policies must, in such instances, extend coverage" (emphasis added); id., 830; has little relevance here. Moreover, if that precedent were to be revisited or overruled, as the plaintiff urges, it remains the exclusive prerogative of our Supreme Court to do so. See, e.g., *State* v. *Corver*, 182 Conn. App. 622, 638 n.9, 190 A.3d 941 ("[i]t is well established that this court cannot overrule or reconsider the decisions of our Supreme Court"), cert. denied, 330 Conn. 916, 193 A.3d 1211 (2018).

provided by the policy. See *Capstone Building Corp.* v. *American Motorists Ins. Co.*, supra, 308 Conn. 805.

## II

We next consider whether the court properly concluded that the plaintiff met its burden of establishing that two exclusions to coverage clearly and unambiguously applied in the present case. In its memorandum of decision, the court concluded that all of the claims in the civil action fell under the intentional conduct exclusion contained in §III. A. 12. of the policy and the sexual conduct exclusion contained in §III. A. 10. The defendant claims, and we agree, that both determinations were improper.

As a preliminary matter, we note that the plaintiff, as the party seeking summary judgment, bore the burden "to establish that there are no genuine issues of material fact as to whether the allegations fall entirely within the policy exclusion." *State Farm Fire & Casualty Co.* v. *Tully*, 322 Conn. 566, 583 n.10, 142 A.3d 1079 (2016). We also are mindful that "Connecticut law favors a narrow construction" of insurance policy exclusions. *Nash Street, LLC* v. *Main Street America Assurance Co.*, supra, 337 Conn. 26. As our Supreme Court has explained, "[w]hen construing exclusion clauses, the language should be construed in favor of the insured unless it has a high degree of certainty that the policy language clearly and unambiguously excludes the claim." (Internal quotation marks omitted.) *Nationwide Mutual Ins. Co.* v. *Pasiak*, 327 Conn. 225, 239, 173 A.3d 888 (2017). Accordingly, an insurer "is only entitled to prevail under a policy exclusion if the allegations of the complaint clearly and unambiguously establish the applicability of the exclusion to each and every claim for which there might otherwise be coverage under the policy." *Lancia* v. *State National Ins. Co.*, 134 Conn. App. 682, 691, 41 A.3d 308, cert. denied, 305 Conn. 904, 44 A.3d 181 (2012).

## A

The defendant contends that the court improperly determined that the intentional conduct exclusion

contained in §III. A. 12. of the policy clearly and unambiguously applied to every claim in the underlying complaint. We agree.

Section III. A. 12. of the policy provides in relevant part that "[t]he coverage afforded under this policy . . . does NOT apply to the following . . . any willful, wanton, intentional, dishonest, fraudulent, criminal, illegal or malicious act or omission . . . ." In rendering summary judgment in favor of the plaintiff, the court concluded that, notwithstanding the fact that two of their six counts sounded in negligence, the civil action plaintiffs in those counts alleged "that the defendant intentionally used his own sperm to impregnate their mothers without consent and without providing information on his genetic composition . . . ."

"The interpretation of pleadings is always a question of law for the court . . . . Our review of the trial court's interpretation of the pleadings therefore is plenary." (Internal quotation marks omitted.) *Grenier* v. *Commissioner of Transportation*, 306 Conn. 523, 536, 51 A.3d 367 (2012). In light of the procedural posture of this case, we are obligated to construe the allegations of the underlying complaint in the light most favorable to the defendant, as the nonmoving party to the summary judgment rendered by the trial court. See *Panaro* v. *Electrolux Corp.*, supra, 208 Conn. 591; *Dorfman* v. *Liberty Mutual Fire Ins. Co.*, supra, 227 Conn. App. 391 n.27.

Our analysis focuses on the first two counts of that complaint. The civil action plaintiffs captioned count one as a "negligence" claim. In that count, they alleged, inter alia, that Kayla's parents "had been treating with [the defendant] in his professional capacity, in their efforts to become pregnant"; that "[t]hey never engaged [the defendant] as a sperm donor"; that "[t]hey were never given a choice of any sperm donor"; that "[t]hey had no information of [the defendant's] . . . genetic diseases or illnesses"; that, "[p]rior to the pregnancy, they were not advised that the sperm would be anything but [Gary Suprynowicz's] sperm"; that Kayla's "mother was

never given the choice of a sperm donor, nor was she ever advised of the identity of the sperm donor"; and that, "after she became pregnant, [Kayla's] mother was advised that the pregnancy was the result of 'mixed sperm.'" The civil action plaintiffs then set forth four distinct allegations of negligence on the part of the defendant, averring that the defendant negligently **(1)** "mixed his sperm with [Gary] Suprynowicz's sperm to impregnate" Kayla's mother; **(2)** "replaced the sperm of Gary Suprynowicz with his own"; **(3)** "failed to offer [Kayla's parents] the choice of sperm donor"; and **(4)** "utilized sperm that contained a genetic trait including a genetic disease, leading to Kayla's contracting a cerebral condition and mass cell activation disorder." Count one concluded by alleging that Kayla sustained injuries "[a]s a result of [the defendant's] negligence . . . ."

The civil action plaintiffs captioned count two as a "fraudulent concealment" claim. That claim incorporated by reference all of the allegations set forth in count one. It then alleged that the defendant had "fraudulently concealed from Kayla" the fact that **(1)** "[h]e improperly mixed his own sperm with Gary Suprynowicz's to create the embryo which became Kayla . . . "; **(2)** "[h]e improperly replaced Gary Suprynowicz's sperm with his own . . . "; and **(3)** "[the defendant's] sperm contained certain genetic traits that caused her to contract a cerebral condition and mass cell activation disorder." Count two concluded by alleging that Kayla sustained injuries "[a]s a result of [the defendant's] fraudulent acts . . . ."

Unlike negligence, fraudulent concealment requires intentional conduct on the part of a defendant.[12] See,

---

[12] Fraudulent concealment is widely recognized as an intentional tort in other jurisdictions. See, e.g., *Nebraska Plastics, Inc.* v. *Holland Colors Americas, Inc.*, 408 F.3d 410, 419 (8th Cir. 2005); *Nissan Motor Acceptance Corp.* v. *Superior Automotive Group, LLC*, 63 Cal. App. 5th 793, 829, 277 Cal. Rptr. 3d 914 (2021); *McWhinney Centerra Lifestyle Center, LLC* v. *Poag & McEwen Lifestyle Centers-Centerra, LLC*, 486 P.3d 439, 455 (Colo. App. 2021); *Picher* v. *Roman Catholic Bishop of Portland*, 82 A.3d 101, 102 (Me. 2013); *T.C. Power & Bro.* v. *Turner*, 97 P. 950, 955 (Mont. 1908); *Houghton* v. *Malibu Boats, LLC*, Docket No. E2023-00324-SC-R11-CV, 2025 WL 2971436, *2 (Tenn. October

e.g., *Frost* v. *ADT, LLC*, 947 F.3d 1261, 1272 n.5 (10th Cir. 2020) ("fraudulent concealment requires affirmative and intentional conduct"); *Migliori* v. *Boeing North American, Inc.*, 97 F. Supp. 2d 1001, 1012 (C.D. Cal. 2000) ("[f]raudulent concealment, by definition, requires an intent to conceal information"); *Green* v. *West Haven Board of Education*, Superior Court, judicial district of New Haven, Docket No. CV-21-6114834-S (April 6, 2023) (noting that plaintiff's negligence claim "does not sound in an intentional tort" and "starkly contrasts" with fraudulent concealment claim); *Picher* v. *Roman Catholic Bishop of Portland*, 974 A.2d 286, 290 (Me. 2009) ("we treat the intentional tort claim of fraudulent concealment differently from the negligence claims").

In preparing the underlying complaint against the defendant, which was filed at the outset of litigation, the civil action plaintiffs were under no compulsion to choose between a negligence theory or an intentional conduct

22, 2025); *Sundown, Inc.* v. *Pearson Real Estate Co.*, 8 P.3d 324, 333 (Wyo. 2000); see also 3 Restatement (Second), Torts § 550, p. 118 (1977).

In Connecticut, a statutory cause of action for fraudulent concealment exists, which operates to toll an otherwise applicable statute of limitations. See General Statutes § 52-595. That statute requires proof of intentional conduct on the part of a defendant. See *Bartone* v. *Robert L. Day Co.*, 232 Conn. 527, 533, 656 A.2d 221 (1995). In the fraudulent concealment counts of their complaint, the civil action plaintiffs did not reference § 52-595 in any manner. They also did not allege that the defendant concealed certain facts "for the purpose of obtaining delay on the plaintiffs' part in filing a complaint," which is a necessary prerequisite to such a statutory claim. See id.

The appellate courts of this state have not directly addressed the question of whether an independent cause of action for fraudulent concealment exists under Connecticut law. See *Willow Springs Condominium Assn., Inc.* v. *Seventh BRT Development Corp.*, 245 Conn. 1, 36–37, 717 A.2d 77 (1998) (declining to address defendant's claim that fraudulent concealment "cannot be both a tolling mechanism and an independent claim for relief"); cf. *Avoletta* v. *Torrington*, 133 Conn. App. 215, 224, 34 A.3d 445 (2012) (recognizing fraudulent concealment as intentional tort for purposes of applying municipal immunity provided by General Statutes § 52-557n). Moreover, that issue has not been raised by the parties to this appeal. In light of the procedural posture of this case and the applicable standard of review, we therefore assume, without deciding, that the civil action plaintiffs properly pleaded an independent cause of action for fraudulent concealment.

theory of liability regarding the defendant's alleged acts. Rather, they retained the right "[u]nder our pleading practice . . . to advance alternative and even inconsistent theories of liability against one or more defendants in a single complaint." (Internal quotation marks omitted.) *Coppola Construction Co.* v. *Hoffman Enterprises Ltd. Partnership*, 309 Conn. 342, 357, 71 A.3d 480 (2013); see also Practice Book § 10-25 ("[t]he plaintiff may claim alternative relief, based upon an alternative construction of the cause of action"). A principal rationale for permitting such pleading is the reality that, when a plaintiff files a complaint, it often has not engaged in meaningful discovery, where additional material facts may be uncovered.[13]

Our review of the relevant allegations of the first and second counts of the underlying complaint convinces us

[13] See, e.g., *DePaepe* v. *General Motors Corp.*, 141 F.3d 715, 719 (7th Cir. 1998) ("[i]nconsistent pleadings are allowable . . . and the use of discovery to winnow or refine theories of liability should not be discouraged" (citation omitted)); *Eason* v. *Roman Catholic Bishop of San Diego*, 414 F. Supp. 3d 1276, 1282 (S.D. Cal. 2019) ("[n]o controlling authority prevents a plaintiff from pleading alternative legal remedies" because "[d]iscovery may reveal that [the plaintiff's] claims providing legal remedies are inadequate for any number of reasons" (internal quotation marks omitted)); *Danko* v. *Redway Enterprises, Inc.*, 254 Conn. 369, 381, 757 A.2d 1064 (2000) ("Although a plaintiff is, of course, under no obligation to raise [alternative] claims, he or she reasonably may conclude that it is necessary to do so pending the discovery of additional facts. Under those circumstances, one or more of the plaintiff's claims fairly may be described as contingent on the discovery of such additional facts."); *Lone Star College System* v. *Immigration Reform Coalition of Texas*, 418 S.W.3d 263, 273 (Tex. App. 2013) ("alternative pleading is a very common occurrence" because "early in the litigation process . . . the true nature of the plaintiff's claims have [not yet] crystallized through discovery and motions practice"); *West Virginia Mutual Ins. Co.* v. *Matulis*, 251 W. Va. 196, 180, 910 S.E.2d 777 (2024) ("[g]iven that complaints are filed before the parties have conducted any discovery, it will often be desirable to plead claims in both negligence and intentional tort"); Restatement (Third), Torts, Miscellaneous Provisions § 57, comment (c) (Tentative Draft No. 4) (2025) ("[A] plaintiff may proceed on both negligence and intentional tort claims unless and until the facts bearing on whether an intentional tort occurred become established. . . . Facts may . . . become established during discovery, by, for example, requests for admission.").

that the civil action plaintiffs pleaded those negligence and fraudulent concealments counts in the alternative. In this regard, two aspects of their allegations bear particular emphasis. First, we note that both counts alleged that the defendant mixed his sperm with that of Gary Suprynowicz. For the intentional conduct exclusion to apply, the plaintiff bore the burden of establishing both "intentional acts and intentional results" on the part of the defendant. *State Farm Fire & Casualty Co.* v. *Tully*, supra, 322 Conn. 574. Although the first count reasonably may be read as alleging that the defendant deliberately utilized his own sperm while providing IVF services to Kayla's parents, there is no allegation that he intentionally caused the injuries allegedly sustained by Kayla decades after those services were provided—namely, mental anguish, physical injury, and a genetic condition that impaired her earning capacity.

Moreover, a primary defense raised by the defendant is his contention that the mixed sperm method was a common medical practice at the time that he provided professional services to Kayla's parents.[14] In support of that contention, the defendant submitted a medical journal article on that medical practice as an exhibit to his objection to the motion for summary judgment.[15] See footnote 6 of this opinion. In addition, the civil action

[14]In his objection to the motion for summary judgment, the defendant argued that the gravamen of the underlying complaint was the allegation that he "acted as a fertility specialist for the [civil action plaintiffs'] parents in the late 1980s/early 1990s and utilized a process called the mixed sperm method to improve the chances of fertility . . . ." The defendant further averred that the mixed sperm method was "an accepted use" that was "well recognized as an appropriate infertility treatment at the time of the [civil action plaintiffs'] conception." See generally *Harnicher* v. *University of Utah Medical Center*, 962 P.2d 67, 68 (Utah 1998) (mixed sperm method utilized by fertility clinic after artificial insemination using husband's sperm "yielded no results").

[15]Although the question of whether an insurer has a duty to defend normally is determined by comparing the allegations of the complaint with the relevant policy language; see *Misiti, LLC* v. *Travelers Property Casualty Co. of America*, supra, 308 Conn. 154; extrinsic evidence may be relied on to establish "facts [that] support the duty to defend." Id., 161. In the present case, the defendant submitted documentary

plaintiffs alleged, in the first count of their complaint, that, "after she became pregnant, [Kayla's] mother was advised that the pregnancy was the result of 'mixed sperm.'" Construed in the light most favorable to the defendant, that admission supports the defendant's contention that he utilized the mixed sperm method in providing fertility services to Kayla's parents. That admission also provides a reasonable explanation for the civil action plaintiffs' decision to allege, in the alternative, that the defendant's conduct in mixing his own sperm with that of Gary Suprynowicz constituted both negligence and fraudulent concealment.[16]

Second, we note that counts one and two both allege that the defendant's sperm contained a genetic disease that caused Kayla to contract a cerebral condition and mass cell activation disorder. At the same time, the civil action plaintiffs did *not* allege in the negligence count that the defendant was aware that he possessed that genetic disease. Instead, the civil action plaintiffs simply alleged that the defendant had "negligently . . . utilized sperm that contained a genetic trait including a genetic disease . . . ." By contrast, the civil action plaintiffs alleged in the second count that the defendant "fraudulently concealed from Kayla" the fact that "[his] sperm contained certain genetic traits that caused

evidence regarding the mixed sperm medical practice in an effort to raise a genuine issue of material fact as to whether the plaintiff had a duty to defend him in the civil action.

[16] In light of (1) the defendant's averment that he utilized an accepted fertility practice known as the mixed sperm method in providing IVF services to Kayla's parents and the documentary material he submitted in support of his objection to the motion for summary judgment, (2) the civil action plaintiffs' concession that, after she became pregnant, Kayla's mother was informed that her pregnancy was the result of mixed sperm, and (3) the civil action plaintiffs' allegations that the defendant "negligently" mixed his sperm with that of Gary Suprynowicz without offering Kayla's parents "the choice of sperm donor," we conclude that a genuine issue of material fact exists as to whether the defendant used the mixed sperm method in providing fertility services to Kayla's parents. Viewed in in the light most favorable to the defendant, we cannot conclude that his alleged conduct decades ago was "so inherently harmful" that the injuries sustained by Kayla were "unarguably foreseeable" at the time he provided those services to her parents. See *State Farm Fire & Casualty Co.* v. *Tully*, supra, 322 Conn. 575.

her to contract a cerebral condition and mass cell activation disorder." Because the civil action plaintiffs may have been unsure at the time that they commenced this action of whether the defendant had knowledge that his sperm contained the genetic disease in question, they may have purposely pleaded their negligence and fraudulent concealment counts in the alternative with respect to that allegation as well. See footnote 13 of this opinion. Construed in the light most favorable to the defendant, count one alleges that the defendant inadvertently and negligently used sperm that contained a genetic disease when providing IVF services to Kayla's parents. Accordingly, it is beyond the scope of the intentional conduct exclusion. See, e.g., *Great American Ins. Co.* v. *Houlihan Lawrence, Inc.*, 449 F. Supp. 3d 354, 367 (S.D.N.Y. 2020) (intentional conduct exclusion did not apply when allegations of complaint "liberally construed . . . could support . . . a finding [of negligence]"); *Lavoie* v. *Dorchester Mutual Fire Ins. Co.*, 560 A.2d 570, 571 (Me. 1989) (intentional conduct exclusion did not apply where complaint alleged negligence as alternative to intentional tort claims); *Automobile Ins. Co. of Hartford* v. *Cook,* 7 N.Y.3d 131, 137–38, 850 N.E.2d 1152, 818 N.Y.S.2d 176 (2006) (insurer could not avail itself of intentional conduct exclusion where complaint alleged both negligence and intentional conduct).

In its memorandum of decision, the court relied in part on *State Farm Fire & Casualty Co.* v. *Tully*, supra, 322 Conn. 574–75, in which our Supreme Court stated: "[W]here . . . the policy excludes coverage for damages resulting from intentional acts, the court examines the factual allegations to decide whether both intentional acts and intended results are present. . . . [E]ven when an action is [pleaded] as an unintentional tort [such as negligence], the court examines the alleged activities in the complaint to determine whether the insured intended to commit both the acts and the injuries that resulted. If so, regardless of the title of the action, the court holds the action to be outside the coverage of the policy." (Citations omitted; internal quotation marks omitted.)

Applying that precedent, the trial court then reasoned that, "[n]otwithstanding that some of the allegations in the [underlying] action are framed as negligence claims, the [civil action plaintiffs] . . . allege that the defendant *intentionally* used his own sperm to impregnate their mothers without consent and without providing information on his genetic composition or the genetic diseases or illnesses in his lineage, and that they suffered harm as a result." (Emphasis added.)

We do not agree with that conclusion. Nowhere in the first count of the complaint did the civil action plaintiffs allege that the defendant intentionally mixed his sperm with that of Gary Suprynowicz to cause the injuries sustained by Kayla or that he intentionally used sperm that he knew contained a genetic disease; rather, they specifically alleged that the defendant "negligently" did so. As our Supreme Court observed in *Suprynowicz* v. *Tohan*, supra, 351 Conn. 77, the negligence claims advanced by the civil action plaintiffs "are ordinary negligence claims . . . because they arise from the defendant doctor's alleged negligence in using his own sperm to impregnate the [civil action plaintiffs'] mothers during [IVF] procedures." Accordingly, this is not a case in which the allegations in count one "are plainly inconsistent with a negligence claim" or "plainly describe intentional conduct," as was the case in *General Ins. Co. of America* v. *Okeke*, 182 Conn. App. 83, 99, 189 A.3d 158 (2018).

In its memorandum of decision, the court also opined that applying the intentional conduct exclusion to the negligence counts pleaded by the civil action plaintiffs was "consistent with the policies underlying liability insurance." The court further stated that, "[i]f the defendant's alleged conduct of using his own sperm to impregnate patients without consent was not considered an intentional act, then similarly situated fertility doctors could buy liability insurance in advance and have a shield for liability should they choose to engage in the same conduct." For multiple reasons, we are troubled by that assessment. First and foremost, claims that allege

negligent conduct on the part of an insured—like count one here—plainly are beyond the scope of the intentional conduct exclusion. Second, in broadly construing the intentional conduct exclusion contained in § III. A. 12. of the policy, the court overlooks its obligation to narrowly construe insurance policy exclusions. See *Nash Street, LLC* v. *Main Street America Assurance Co.*, supra, 337 Conn. 19. Third, nothing prevents an insurer from crafting medical professional liability insurance policies that specifically disclaim coverage for the conduct at issue in this case. Alternatively, insurers can include additional exclusions specifically tailored to that scenario. See, e.g., *USA Gymnastics* v. *Liberty Ins. Underwriters, Inc.*, 27 F.4th 499, 512 (7th Cir. 2022) ("[i]nsurers are free to limit the coverage of their policies" (internal quotation marks omitted)); *Medical Protective Co.* v. *Watkins*, 198 F.3d 100, 104–105 (3d Cir. 1999) ("[t]he burden of precisely drafting the policy rested with the insurance company and scrivener . . . and it was free to employ more precise language"); *Merchants Ins. Co. of New Hampshire, Inc.* v. *United States Fidelity & Guaranty Co.*, 143 F.3d 5, 10 (1st Cir. 1998) ("if [the insurer] had really intended to limit coverage [with respect to specific conduct] . . . [the insurer] was free to draft a policy with qualifying language that expressly implemented that intention"); *McLaughlin* v. *Connecticut General Life Ins. Co.,* 565 F. Supp. 434, 449 (N.D. Cal. 1983) ("[t]he simple answer to [the] defendant's contentions is that it should have taken the public policy it urges this court to adopt into consideration when it drafted its contract"); *Misiti, LLC* v. *Travelers Property Casualty Co. of America*, supra, 308 Conn. 179 (*Eveleigh, J.*, dissenting) ("if an insurer wished to exclude from its coverage liability based on the type of injury that occurred in the present case . . . it would be free to do so").

Under Connecticut law, an insurer "is only entitled to prevail under a policy exclusion if the allegations of the complaint clearly and unambiguously establish the applicability of the exclusion to each and every claim for which there might otherwise be coverage under the

policy." *Lancia* v. *State National Ins. Co.*, supra, 134 Conn. App. 691. That standard has not been met in the present case. The court, therefore, improperly concluded that the intentional conduct exclusion applied to every allegation of negligence in the underlying complaint.

### B

The defendant also claims that the court improperly determined that the sexual conduct exclusion contained in §III. A. 10. of the policy clearly and unambiguously applied to every claim in the underlying complaint. We agree.

Section III. A. 10. of the policy provides in relevant part that "[t]he coverage afforded under this policy, both as to defense and payment of damages, does NOT apply to the following . . . any injury or damage, whether direct or consequential, arising out of any sexual intimacy, sexual molestation, sexual harassment, sexual exploitation, sexual assault or sexual contact . . . ."[17] In rendering summary judgment in favor of the plaintiff, the court concluded that the plaintiff had demonstrated that every allegation in the underlying complaint fell within the sexual conduct exclusion.

A closer look at count one of the complaint belies that determination. In that count, the civil action plaintiffs alleged, inter alia, that Kayla's parents "had been treating with [the defendant], a reproductive endocrinologist, in his professional capacity, in their efforts to become pregnant"; that, "[p]rior to the pregnancy, they were not advised that the sperm would be anything but [Gary] Suprynowicz's sperm"; that "after she became pregnant, her mother was advised that the pregnancy was the result of 'mixed sperm'"; that the defendant negligently "mixed his sperm with [Gary] Suprynowicz's sperm to impregnate" her mother; that the defendant

---

[17] The policy does not define the terms "sexual intimacy," "sexual molestation," "sexual harassment," "sexual exploitation," "sexual assault," or "sexual contact." As commonly used; see *New London County Mutual Ins. Co.* v. *Nantes*, 303 Conn. 737, 753, 36 A.3d 224 (2012); those terms all pertain to conduct that is sexual in nature.

negligently "failed to offer [her parents] the choice of sperm donor," and that the defendant negligently utilized sperm that contained a genetic disease. Significantly, that count does not allege that the defendant committed a sexual act, nor does it contain any reference to "sex" or "sexual." See, e.g., *Illinois State Medical Ins. Services, Inc.* v. *Cichon*, 258 Ill. App. 3d 803, 809, 629 N.E.2d 822 (1994) (noting that "[n]one of the complaints expressly allege that [the defendant physician] engaged in sexual conduct" in concluding that sexual conduct exclusion to medical professional liability insurance policy did not apply); *West Virginia Mutual Ins. Co.* v. *Matulis*, 251 W. Va. 180, 202, 910 S.E.2d 777 (2024) (emphasizing that "[t]he complaint does not allege sexual acts, activities or misconduct, or describe the plaintiff as a victim of sexual assault" in concluding that sexual conduct exclusion did not apply); contra *American Commerce Ins. Co.* v. *Porto*, 811 A.2d 1185, 1191 n.3 (R.I. 2002) (sexual conduct exclusion applied where underlying complaint contained allegations that insured "sexually assaulted" victim and engaged in "inappropriate sexual conduct").

The plaintiff nonetheless claims that the sexual conduct exclusion applies because "procreation is quintessentially sexual."[18] That contention overlooks the fact that procreation was the purpose of the professional services rendered in this case. As the underlying complaint makes clear, the civil action concerns the defendant's provision of fertility services to the civil action plaintiffs' parents through IVF procedures, which undoubtedly are medical procedures. See *Doe* v. *Doe*, 244 Conn. 403, 419, 710 A.2d 1297 (1998) (explaining that "[a]rtificial insemination involving humans dates back at least to the late 1770s" and now is "an established treatment for fertility problems in the United States"); *North Coast Women's Care Medical Group, Inc.* v. *Superior Court*, 44 Cal. 4th 1145, 1152 n.3, 189 P.3d 959, 81 Cal. Rptr. 3d 708 (2008) ("[IVF] is a medical procedure of assisted reproduction in which eggs and sperm are combined in

---

[18] In its memorandum of decision, the court similarly stated that "[i]mpregnating someone is an inherently sexual act."

a laboratory dish"); see also General Statutes § 38a-536 (requiring group health insurance policies to "provide coverage for the medically necessary expenses for the diagnosis and treatment of infertility, including, but not limited to . . . [IVF]").

At oral argument before this court, the plaintiff's counsel conceded that IVF is not inherently sexual but argued that the defendant's alleged use of his own sperm brings his conduct within the purview of the sexual conduct exclusion. For two distinct reasons, we cannot agree. First, as discussed in part II A of this opinion, a genuine issue of material fact exists as to whether the defendant properly utilized the mixed sperm method in providing fertility services to Kayla's parents. See *West Virginia Mutual Ins. Co.* v. *Matulis*, supra, 251 W. Va. 197 ("conduct by health care professionals may be either permissible or inappropriate depending on whether the action is taken for medical purposes or for purposes of sexual gratification"). Second, it bears emphasis that count one of the underlying complaint alleged negligence on the part of the defendant in multiple respects. Although that count alleges that the defendant negligently mixed his own sperm with that of Gary Suprynowicz to impregnate Kayla's mother, it also alleges that he negligently failed to offer her parents "the choice of sperm donor" and negligently utilized sperm that contained a genetic disease. We fail to see how either of the latter two negligence allegations implicate the sexual conduct exclusion in any way.

We also reiterate that the civil action plaintiffs did not allege in count one that the defendant was aware that his sperm contained a genetic disease or that he knowingly used sperm that contained a genetic disease when providing IVF services to Kayla's parents. In our view, that specific allegation constitutes an ordinary claim of negligence on the part of the defendant, and one that is not sexual in nature. See, e.g., *Chung* v. *Physicians Reciprocal Insurers*, 221 App. Div. 2d 907, 907, 635 N.Y.S.2d 386 (1995) (sexual conduct exclusion did

not apply where "[t]he allegations of the complaint do not cast the pleading solely within the [sexual conduct] exclusion" and "can reasonably be read as alleging that [the physician] was negligent in his professional treatment"); contra *State Farm Fire & Casualty Co.* v. *Tully*, supra, 322 Conn. 583 ("[n]othing about the allegations in the underlying civil action involve a negligent act"). The sexual conduct exclusion, therefore, does not apply to that claim.

The plaintiff also argues that some allegations of count one could be construed as implicating the crime of sexual assault in the fourth degree pursuant to General Statutes § 53a-73a, which provides in relevant part that "(a) [a] person is guilty of sexual assault in the fourth degree when . . . (5) such person subjects another person to sexual contact and accomplishes the sexual contact by means of false representation that the sexual contact is for a bona fide medical purpose by a health care professional . . . ."[19] In so arguing, the plaintiff misunderstands the fundamental nature of the inquiry before us. The question is not whether some allegations set forth in the underlying compaint, viewed in the light most favorable to the plaintiff in moving for summary judgment, could potentially support such an action, but whether, irrespective of that claim, there remain any allegations that, *construed in the light most favorable to the defendant*, fall outside the scope of the sexual conduct exclusion, such as the allegation that the defendant negligently utilized sperm that contained a genetic disease when providing IVF services to Kayla's parents.[20]

In moving for summary judgment, the plaintiff bore the burden "to establish that there are no genuine issues

---

[19] In the underlying complaint, the civil action plaintiffs acknowledged that, "after she became pregnant, [Kayla's] mother was advised that the pregnancy was the result of 'mixed sperm.'" Kayla's parents nevertheless did not bring a civil action against the defendant or pursue criminal charges after being so advised, and neither Kayla's parents nor Reilly's parents are parties to the civil action.

[20] Moreover, as this court has noted, "[s]exual assault in the fourth degree is a specific intent crime." *State* v. *Vickers*, 228 Conn. App. 830,

of material fact as to whether the allegations fall entirely within the policy exclusion." *State Farm Fire & Casualty Co.* v. *Tully*, supra, 322 Conn. 583 n.10. To do so, the plaintiff must demonstrate that "the allegations of the complaint clearly and unambiguously establish the applicability of the exclusion to each and every claim for which there might otherwise be coverage under the policy." *Lancia* v. *State National Ins. Co.*, supra, 134 Conn. App. 691; see also *Smith* v. *Liberty Mutual Ins. Co.*, 201 A.3d 555, 573 (Del. Super. 2019) ("because it has not been shown that each allegation of the [u]nderlying [c]omplaint was . . . an act of sexual misconduct and because at least one of the allegations potentially supports a claim under the insurance policy, [the] [d]efendant cannot rely on the . . . [s]exual [m]isconduct [e]xclusion to avoid its duty to defend"). In this case, we do not possess a "high degree of certainty"; *Kelly* v. *Figueiredo*, 223 Conn. 31, 37, 610 A.2d 1296 (1992); that the sexual conduct exclusion contained in §III. A. 10. of the policy clearly and unambiguously applies to each and every negligence allegation set forth in the underlying complaint. See *Nationwide*

846, 326 A.3d 287 cert. denied, 350 Conn. 930, 326 A.3d 556 (2024). A necessary element of §53a-73a (a) (5) is a false representation made by the health care professional. That element requires proof that the health care professional made the statement in question with knowledge of its falsity. See, e.g., *Companions & Homemakers, Inc.* v. *A&B Homecare Solutions, LLC*, 348 Conn. 132, 144, 302 A.3d 283 (2023) (fraudulent misrepresentation requires proof that representation "was known to be untrue by the defendant"); *Reid* v. *Landsberger*, 123 Conn. App. 260, 281, 1 A.3d 1149 (explaining that "[a] cause of action for intentional misrepresentation is essentially a claim of fraud" that requires "a false representation [that] was made as a statement of fact" that was "known to be so by its maker" (internal quotation marks omitted)), cert. denied, 298 Conn. 933, 10 A.3d 517 (2010), and cert. denied, 298 Conn. 933, 10 A.3d 517 (2010). While the allegations in the fraudulent concealment counts of the underlying complaint may be read to assert fraudulent misrepresentations on the part of the defendant, that is not the case with respect to several of the negligence allegations in count one, such as the allegations that the defendant negligently "failed to offer [Kayla's parents] the choice of sperm donor" and that he negligently utilized sperm that contained a genetic disease. Viewing the allegations in the light most favorable to the defendant, we cannot construe those claims as ones alleging that the defendant made representations to Kayla's parents with knowledge of their falsity.

*Mutual Ins. Co.* v. *Pasiak*, supra, 327 Conn. 239. We, therefore, conclude that the court improperly rendered summary judgment in favor of the plaintiff on that basis.

The judgment is reversed in part and the case is remanded with direction to deny the plaintiff's motion for summary judgment; the judgment is affirmed in all other respects.

In this opinion the other judges concurred.